**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Earl WYATT, Defendant-Appellant.**

**No. 18350.**

United States Court of Appeals,
Seventh Circuit.

Feb. 4, 1971.

R. R. McMahan, Chicago, Ill., for defendant-appellant; Lord, Bissell & Brook, Chicago, Ill., of counsel.

Stanley B. Miller, U. S. Atty., Charles H. Scruggs, John E. Hirschman, Asst. U. S. Attys., S.D.Ind., Indianapolis, Ind., for plaintiff-appellee.

Before DUFFY, Senior Circuit Judge, and FAIRCHILD and KERNER, Circuit Judges.

DUFFY, Senior Circuit Judge.

After a bench trial, defendant Wyatt was found guilty of receiving and concealing a stolen motor vehicle in violation of Title 18 U.S.C. § 2313 (The Dyer Act). He was sentenced to imprisonment for two and a half years and fined $1,000. The prison sentence was suspended and defendant was placed on a two and a half year probation.

Defendant, living with his wife and two sons, was a resident of Indianapolis,

Indiana. The story leading up to his arrest on June 19, 1968 at Indianapolis is indeed bizarre.

The story begins on March 28, 1968, about two and a half months prior to defendant's arrest. On that date, Mrs. James P. Marx of El Paso, Texas, decided to rent two automobiles, one for her own use and one for the use of her friend, Florence Collins.

Mrs. Marx and Mrs. Collins went to the Hertz Corporation's rental office at El Paso International Airport where Mrs. Marx signed an agreement to rent a 1968 Ford which is the automobile in question in this case. The automobile was described as a White Ford 1968 4-door identified by Hertz as No. 255. A Texas license plate was on the automobile and it had a Hertz car company license number somewhere on the left side of the mirror and letters and ownership papers were in the glove compartment of the car.

The rental agreement (Government Exhibit 3) indicated that the rental fee was charged on a "Chevron National" credit card issued to James P. Marx. The agreement also provided that the automobile was to be returned by "3/29/68 PM" which was the day following the date of the agreement.

Mrs. Marx also executed an endorsement authorizing Mrs. Collins to drive the automobile. This endorsement also provided that Mrs. Marx was to pay all charges and would be responsible for all loss or damage incurred or sustained as a result of the use of the automobile by the additional driver.

Mrs. Collins drove the rented Ford around El Paso for two or three days. A Paul Kluck whom she had known for two or three weeks, and a couple named William Hicks and Jeannie Math whom Mrs. Collins had known briefly, drove around El Paso with Mrs. Collins, and then all of them left that city together. William Hicks testified he had been with Mrs. Collins on March 28, 1968, drinking all over El Paso and that they had used a White 1967 or 1968 Ford to get around in.

It took about 24 hours for the four to drive from El Paso to Owensboro, Kentucky, where they all stayed for two or three days, and then, at the instigation of William Hicks and Jeannie Math, Mrs. Collins drove these two to Indianapolis. Paul Kluck remained in Owensboro. Mrs. Collins testified she didn't know any one in Indianapolis and intended to return to Owensboro.

The three arrived in Indianapolis on April 6, 1968. They first drove to the homes of Hicks' brother-in-law and brother. They then drove to the Brookside tavern where they spent a number of hours drinking or until the tavern was closing in the early hours of the next morning. The rented Ford was parked outside the tavern close to the entrance. Mrs. Collins testified that she left the tavern about closing time intending to return to Owensboro but that the car would not start. Two men who looked at the car reported to her that a coil of wire and some other things had been removed; also, that one of the tires was flat.

Upon hearing that the car would not run, Mrs. Collins testified she called Paul Kluck in Owensboro who told her he would call Hertz and let them know where the car was and that he would take care of it. Mrs. Collins returned to Owensboro by bus. She never again saw the car after leaving it outside the Brookside tavern.

On April 5, 1968, the El Paso police department recorded a report from Mrs. Marx that the Hertz vehicle had been stolen by Mrs. Collins. Mrs. Collins was indicted for an alleged violation of the Dyer Act. However, on November 15, 1968, the Government dismissed this indictment on the ground that evidence of the offense was inconclusive.

Nothing is known of the whereabouts or location of the automobile in question for the period of over two months after Mrs. Collins left it outside the Brookside

tavern. However, on June 19, 1968 it was seen in the driveway of defendant's home by an F.B.I. informer.

The F.B.I. entered the case by reason of a "fluke" as agent Winters described it. He and two other agents were following a man named Billy Fleming who had a Dyer Act record. They stopped Fleming and they told him they were looking for a car from Texas. This was a ruse, and had nothing to do with the Ford car here in question. Fleming testified he had heard of a Texas car that was for sale.

Fleming agreed to become an informer for the F.B.I. and to act as an intermediary for agent Winters who was posing as a man interested in buying the Texas car. Fleming set up an appointment to buy the White Ford car through his brother-in-law Hobart Hicks who was a brother of the William Hicks whom Mrs. Collins had driven from Owensboro, Kentucky, to Indianapolis. It is not suggested that Florence Collins knew the defendant or knew anything of the Hicks' relationship.

On the morning of June 19, 1968, Fleming and Hobart Hicks met and talked with defendant while agent Winters remained in the background. They then accompanied the defendant to his home where they examined the 1968 White Ford which was located in the driveway. Fleming then drove the Ford to a restaurant and agent Winters examined it and determined that it was the vehicle that Mrs. Marx had leased from Hertz in El Paso. Fleming then drove the Ford to a parking lot of a Little League Baseball field and left it there. Defendant then came by, got into the Ford and drove it away. He stopped by the roadside where he was arrested by the agents who had followed him. It was testified that defendant had approached the rear of the Ford with an Indiana license plate in his hand. An examination of the car revealed that the Hertz rental agreement was in the glove compartment but that the Hertz window decals and original Texas plates had been removed.

The charge in the indictment was that defendant "did receive and conceal a stolen motor vehicle, that is, a 1968 White Ford 4-door hardtop, which was moving in interstate commerce from El Paso, State of Texas, to Indianapolis, State of Indiana, and he knew the motor vehicle to have been stolen, in violation of Title 18 U.S.C. § 2313."

The only direct evidence offered to prove the automobile in question was a stolen automobile is the April 5, 1968 complaint report from the El Paso Police Department. According to this report, Mrs. Marx charged Florence Collins had stolen the car which Mrs. Marx had leased and had authorized Mrs. Collins to drive.

■ The trial court received the Police Report in evidence over the objection that it contained inadmissible hearsay statements. In this respect, defendant now urges that the report could not be admitted as direct evidence that the car had been stolen some time before April 5. We agree. It has been held that a police report is not admissible for the purpose of establishing the truth of a third party's statement that an automobile has been stolen because such report constitutes hearsay which is incompetent for that purpose. United States v. Burruss, 418 F.2d 677, 678 (4 Cir. 1969); United States v. Shiver, 414 F.2d 461–463 (5 Cir. 1969); United States v. Graham, 391 F.2d 439, 447 (6 Cir., 1968), cert. den. 393 U.S. 941, 89 S.Ct. 307, 21 L.Ed.2d 278 (1968).

Since the police report would be inadmissible to prove actual theft before April 5 (in other words, before the car reached Indiana), proof of the theft must have come from other circumstantial evidence. We agree with the Government that enough proof was offered to show that the car had been stolen some time before June 19, 1968, and that thus the theft element of the § 2313 charge has been sustained. However, since the actual date and place of the theft may have some bearing on the interstate commerce element of the offense, we

shall now consider the proof offered to show where and when the car was first stolen. Throughout this litigation, the Government has advanced several theories attempting to prove that the car was stolen before it reached Indiana. We realize that the interstate commerce element of a § 2313 charge is a factual question which will not be disturbed on appeal if supported by substantial evidence. (Pilgrim v. United States, 5 Cir., 266 F.2d 486). Even acknowledging this, we do not feel that the Government's arguments on when the vehicle in question was stolen find any support in the record.

■ It is first argued that Mrs. Collins stole the car in Texas by failing to return it there on March 29 as required by the rental agreement. However, as the trial judge correctly pointed out, the rental agreement was signed by Mrs. Marx, not by Mrs. Collins, and no evidence was submitted to show that Mrs. Collins knew what its terms were. Instead, there is Mrs. Collins' testimony that she did not know that the car was to be returned in one day, and that she believed she had permission to travel out of Texas for at least several days. Moreover, it is helpful to remember that the Government's indictment against Mrs. Collins for theft was dismissed for insufficient evidence.

Equally unpersuasive is the argument that Mrs. Marx should be viewed as having stolen the car on March 29 when she failed to return it. Although we recognize that such actions can constitute a conversion and hence, a theft, within the meaning of the Dyer Act (United States v. Meek, 7 Cir., 388 F.2d 936), the intent to steal is always important in those cases. Here, we have no evidence of any felonious intent on the part of Mrs. Marx when she rented the car on March 28 (on her valid credit card). Moreover, we do know that the Hertz Corporation did not file a vehicle conversion report with the El Paso Police Department until April 30. It is thus possible that when the car reached Indiana on April 6, it had not even been considered stolen by its rightful owner, Hertz.

Finally, the Government argues that the trial court could have believed that William Hicks "either at Owensboro or during the trip from Owensboro or in Indianapolis formed an intent to steal the vehicle in Indianapolis", that he contacted his brother-in-law, that he deliberately damaged the car at the Indianapolis bar, that he then stole the car and transferred it to defendant. Thus, according to the Government, a theft was in progress while the car was moving in interstate commerce from Owensboro, Kentucky, to Indianapolis, Indiana, which was "consummated" by the events at the tavern. However, there is not one shred of evidence in the record to support this position. We know nothing of Williams Hicks' intent, or of any contact with his brother-in-law, or of how the car became damaged at the tavern, or of how defendant ultimately obtained the car.

■ On the basis that as no theft was proven during any period before the Ford automobile reached Indiana, the defendant urges that he is thereby entitled to a reversal of his conviction. The Government argues that even if the Ford automobile was never taken out of Indiana, the interstate commerce element was sufficiently proven. We disagree. We think that important element was not sufficiently proven by the Government in this case. Of course, the burden of proof on all essential points was on the Government.

As a matter of statutory construction, the Government is correct in asserting that § 2313 can be read as having a somewhat broader reach than § 2312. The latter section penalizes the transportation of a stolen vehicle in interstate commerce where § 2313 proscribes the receipt and concealment of a motor vehicle which is moving in or is a part of interstate commerce. Under § 2312, the vehicle must be stolen before it is transported. However, the answer to that question under § 2313 is not so clear.

The controlling decision is Brooks v. United States, 267 U.S. 432, 439, 45 S. Ct. 345, 347, 69 L.Ed. 699 (1925). This decision clearly narrowed the scope of § 2313. In that case, the constitutionality of the Dyer Act was sustained. In referring to § 2313, the Court said: "Of course, this section can and does apply only to the storing or concealment of a stolen automobile with knowledge of its theft, as a final step in the use of interstate transportation to promote the scheme of its unlawful disposition and the withholding of it from its owner."

The decisions since *Brooks* dealing with the interstate commerce question have followed the rule laid down in that case. Cases often have had to deal with what type of interstate scheme might have existed which would support a conviction, even though a car might have been in one state for a prolonged period of time. Powell v. United States, 410 F.2d 710 (5 Cir., 1969); United States v. Briddle, 430 F.2d 1335, 1339 (8 Cir., 1970). Moreover, other decisions have recognized that even with some prior illegal use of interstate commerce present, "[a car's] character of being a part of interstate commerce does not continue indefinitely after its transportation ends." Schwachter v. United States, 6 Cir., 237 F.2d 640; United States v. Grimsley, 5 Cir., 50 F.2d 509; Davidson v. United States, 8 Cir., 61 F.2d 250. It is our understanding that no case ever has held that the interstate commerce element of a Section 2313 charge is satisfied where there has been no "prior use of interstate transportation to promote the scheme" at all.

It is true that the cases have recognized that a temporary presence in one state followed by a subsequent illegal use of interstate commerce is enough to satisfy the statute, but that was not proven to be the case here. By contrast, we note that in United States v. Meek, 388 F.2d 938, this Court recognized that the fact that a car may have temporarily come to rest within a particular state "does not preclude the drawing of an inference that the car was still moving in interstate commerce." But in *Meek,* the Court viewed as determinative, the fact that the defendant had journeyed to another state to obtain false papers and had stated that he intended to take the car to some other state for resale. Here, there was no similar evidence of defendant's intent to take the car out of Indiana or in any other way to use interstate commerce as part of a scheme to dispose of the car.

It is argued that the car here may still be viewed as in interstate commerce because it belonged back in Texas, or, at least, in Owensboro, Kentucky. Aside from the fact that this position contradicts the Government's charge in the indictment which was that defendant concealed a car moving in interstate commerce from Texas to Indiana (not the other way around), this argument begs the question. Under such reasoning, any car, no matter how long out of a state, would still remain in interstate commerce if its rightful owner lived in another state. The point is not whether some interstate journey of the car ought to be occurring no matter how attenuated it might be, but rather whether some intervening period of the car's presence within one particular state has elapsed which terminates its interstate character.

■ It has been established by our courts that an automobile transported in interstate commerce does not retain its interstate character indefinitely after it has arrived at its destination. The Government can point to no decision holding that it is a federal crime to receive an automobile that has not been transported in interstate commerce between the theft and the receipt of the automobile by the person charged.

The judgment of conviction must be and is reversed with directions to enter a judgment of acquittal.

Judgment reversed.