**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Thomas E. MAZE, Defendant-Appellant.**

**No. 72–1007.**

United States Court of Appeals, Sixth Circuit.

Oct. 4, 1972.

---

William T. Warner, Louisville, Ky. (Court Appointed), for defendant-appellant.

C. Fred Partin, Asst. U. S. Atty., Louisville, Ky., George J. Long, U. S. Atty., Louisville, Ky., on briefs, for plaintiff-appellee.

Before EDWARDS, McCREE and MILLER, Circuit Judges.

McCREE, Circuit Judge.

Defendant appeals from a jury conviction of four counts of using the mails to defraud, in violation of 18 U.S.C. § 1341, and of one count of knowingly transporting a stolen automobile in interstate commerce, in violation of 18 U.S.C. § 2312 (the Dyer Act). We reverse the convictions for mail fraud and affirm the Dyer Act conviction.

The indictment charged that between April 9, 1971, and June 3, 1971, appellant devised a scheme to defraud the Citizens Fidelity Bank & Trust Company of Louisville, Kentucky, Charles L. Meredith, and several merchants in different states by unlawfully obtaining possession of a BankAmericard issued by the Louisville bank to Meredith and by using the card to obtain goods and services. In each of the first four counts of the indictment appellant was charged with purchasing goods or services at specified commercial establishments by presenting Meredith's BankAmericard for payment and representing himself to be Meredith. It was further alleged that appellant knew that each merchant would cause sales slips of the purchases to be delivered by mail to the Kentucky bank, which would, in turn, mail them to Meredith for payment, and that the delay inherent in this mailing would enable appellant to continue purchasing goods and services for an appreciable period of time. The fifth count of the indictment charged that on May 9, 1971, appellant transported a stolen 1964 Chevrolet from Knoxville, Tennessee, to Larue County, Kentucky, with knowledge that the vehicle was stolen.

A week before trial, appellant moved for the dismissal of the first four counts of the indictment on the ground that the conduct described therein was not proscribed by the mail fraud statute. This motion was denied at the beginning of the trial on October 19, 1971, and appellant was subsequently convicted on all five counts and sentenced to concurrent five-year terms.

We first consider appellant's contention that the court erred in denying his motion to dismiss the first four counts of the indictment, or, in the alternative, that the proofs did not show a violation of 18 U.S.C. § 1341.

At trial, the Government showed that appellant had lived in Meredith's apartment in Louisville from February 1971 until April 9, 1971, when he left with Meredith's BankAmericard and 1968 Pontiac Tempest automobile;[1] that on April 10, 1971, Meredith reported the card stolen; and that on four separate occasions in April, appellant used the card to obtain food and lodging at inns in California, Florida, and Louisiana by representing himself to be Meredith.

---

1. Meredith testified that appellant took his wallet containing the credit card and identification papers, as well as his checkbook, watches, and rings.

An official of the Louisville bank testified that all the sales receipts for these transactions were received by the bank in due course through the mail. Representatives of each of the inns testified and, of these witnesses, two stated that they customarily used the mails to transmit BankAmericard sales receipts to the BankAmericard organization, one testified that the receipts went to BankAmericard in some manner, and one testified that he customarily forwarded the receipts to his bank for payment. Each representative identified a sales receipt signed by "Charles Meredith" as a receipt issued by his business establishment on the date and for the amount specified on the receipts. A United States postal inspector testified that, after arrest, appellant made a written statement in which he admitted using the card to make the purchases, and a document analyst for the Postal Service testified that the "Charles Meredith" signature on at least three of the four receipts was written by appellant.

Appellant testified that he had used the BankAmericard with Meredith's permission at least once before his April escapades and that he took the card on April 9 with Meredith's permission. He admitted having used Meredith's card to make the purchases, and he claimed that he did so with Meredith's consent.

Since the jury obviously did not believe appellant's version, and since the proof concerning the existence of a scheme to defraud was overwhelming, the only question before us is one of law: did the Government show that the mails were used for the purpose of executing the scheme?

■■ The mail fraud statute, 18 U.S.C. § 1341, provides in pertinent part:

[w]hoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . *for the purpose of executing such scheme* or artifice or attempting

to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, . . . or knowingly causes to be delivered by mail according to the direction thereon . . . any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both. [Emphasis added.]

The elements of the offense, therefore, are a scheme to defraud and the mailing of a letter for the purpose of executing the scheme, with the mailing either done by the defendant or caused by him. Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954). A mailing is "caused" by the defendant when he knows that the mails will be used in the ordinary course of business or when he can reasonably foresee such use even if he does not actually intend it. Pereira v. United States, *supra*, 347 U.S. at 8–9, 74 S.Ct. 358. It is important to emphasize, however, that "use of the mails must be a step in the execution of the scheme charged in the indictment, and not incidental thereto, in order to constitute an element of the offense under § 1341." United States v. Hopkins, 357 F.2d 14, 16 (6th Cir.), cert. denied, 385 U.S. 858, 87 S.Ct. 107, 17 L.Ed.2d 84 (1966).

■ Accordingly, it is well settled that if the fraudulent scheme has been consummated by the time the mailing occurs, and the mailing, although directly resulting from the existence of the scheme, plays no role or a minimal role in the execution of the scheme, section 1341 has not been violated. Parr v. United States, 363 U.S. 370, 392–393, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944); Stapp v. United States, 120 F.2d 898 (5th Cir. 1941); United States v. McKay, 45 F. Supp. 1001, 1005 (E.D.Mich.1942); *see generally* Anno., 157 A.L.R. 247 (1945). This is not to say that causing a mailing

after the proceeds of the fraudulent scheme have been received can never support a conviction for mail fraud; such a mailing may be employed to lull the victim into a false sense of security to forestall discovery of the scheme, *see* United States v. Sampson, 371 U.S. 75, 80–81, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), or to delay detection of the scheme until the defendant has had the opportunity to evade capture or to perpetrate additional frauds, *see* Kann v. United States, *supra,* 323 U.S. at 94–95, 65 S.Ct. 148; United States v. Hendrickson, 394 F.2d 807 (6th Cir. 1968), cert. denied, 393 U.S. 1031, 89 S.Ct. 642, 21 L.Ed.2d 574 (1969); United States v. Lowe, 115 F.2d 596 (7th Cir. 1940), cert. denied, 311 U.S. 717, 61 S.Ct. 441, 85 L.Ed. 466 (1941); Anno., 157 A.L.R. at 252–54.

It is apparent, then, that the determination in each case brought under section 1341 whether an offense cognizable under that statute has been proved necessarily

> depends upon a careful examination of the evidence . . . to determine the contribution made by mailings to the scheme's success. Conviction under the section is apparently sustainable if it is supported by adequate proof that the offender intended that use of the mails, even if delayed, would promote the fraud's success and if the fraudulent scheme is of sufficient magnitude in its effect is continuing in nature, and contemplates the use of the mails as one of its integral parts.

United States v. Kelem, 416 F.2d 346, 350 (9th Cir. 1969), cert. denied, 397 U.S. 952, 90 S.Ct. 977, 25 L.Ed.2d 134 (1970).

Applying these principles, we determine that the Government did not prove that appellant violated the mail fraud statute. We find this case to be, in all important respects, indistinguishable from the *Kann* and *Parr* cases, *supra.*

In *Kann,* several officers and directors of a corporation were accused of unlawfully diverting corporate profits to themselves. They employed various devices, including the receipt of bonuses from a separate corporation they had set up to obtain a subcontract from the defrauded corporation, and the false representation to a building contractor that they owned certain timber (actually owned by the defrauded corporation) used by the contractor to build a factory for the subcontracting corporation on land owned by the defrauded corporation. The two counts of mail fraud were based on (1) the defendants' cashing of the building contractor's check for the timber, and the subsequent mailing of that check by the bank that cashed it to the drawee bank for payment, and (2) the cashing of a bonus check of the subcontracting corporation by one of the defendants and the subsequent mailing of that check by the bank that cashed it to the drawee bank. The Supreme Court held that neither of these mailings was caused by the defendants for the purpose of executing the fraudulent schemes because by the time of the mailings

> [t]he scheme in each case had reached fruition. The persons intended to receive the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank.

323 U.S. at 94, 65 S.Ct. at 151. In addition, the Court rejected the argument that the scheme was not yet complete after these mailings and that the clearing of these checks was therefore necessary to further prosecution of the scheme. Even under that view, the Court stated,

> the scheme was completely executed as respects the transactions in question when the defendants received the money intended to be obtained by their fraud, and the subsequent banking transactions between the banks con-

cerned were merely incidental and collateral to the scheme and not a part of it.

323 U.S. at 95, 65 S.Ct. at 151.[2]

In *Parr*, officials of a school district were charged with misappropriating and embezzling the district's funds over a five-year period by artifices including causing district funds to be paid to fictitious persons or to persons who had not performed services for which the disbursements were authorized. Some of the defendants were charged with having used the district's gasoline credit card to purchase gasoline and other service station products and services for private purposes. The asserted violation of the mail fraud statute was the "causing" of the oil company to bill the district for the services and the resulting payment by checks that were mailed by the district to the oil company. In reversing convictions based on the misuse of the credit card, the Court determined that *Kann* controlled since the defendants had irrevocably received the services and products before the mailings occurred, and it was immaterial to them how the oil company would collect from the school district. 363 U.S. at 392–393, 80 S.Ct. 1171.

We perceive no substantial difference between the role of the mails in those cases and in this one. Maze obtained goods and services from vendors in several states, and it was immaterial to him how (or whether) they collected their money or who eventually paid for the purchases. Here, as in *Parr*, the scheme was effected by the unauthorized use of a credit card, and here, as in *Parr*, the fraud was directed against the card issuer and the card holder.[3] As far as appellant was concerned, his transaction was complete when he checked out of each motel; the subsequent billing was merely "incidental and collateral to the scheme and not a part of it." *Kann v. United States, supra,* 323 U.S. at 95, 65 S.Ct. at 151.

Moreover, assuming the Government has shown that appellant "caused" the mailings in question, *see* Pereira v. United States, *supra,* 347 U.S. at 8–9, 74 S.Ct. 358,[4] it has not shown that the mailings contributed to the execution of the scheme by affording appellant sufficient delay to permit him to further his fraudulent enterprise. It is true that Maze may have reasonably foreseen that Meredith would not have been billed for the purchases for a period of time, or

---

2. Justice Douglas, joined by three other Justices, dissented. He asserted that the Court would likely not have reached the same result if the payees had deposited the checks for collection rather than cashed them (*see* United States v. Brickey, 426 F.2d 680, 685 (8th Cir.), cert. denied, 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970); United States v. Vidaver, 73 F.Supp. 382, 384 (E.D.Va. 1947)), and he did not see why the cashing of the checks should have mandated a different result. 323 U.S. at 95–96, 65 S.Ct. 148. He observed that the payee-endorsers were liable as endorsers until the checks cleared (*see* Uniform Commercial Code § 3–414(1)), and therefore the proceeds had not been irrevocably obtained before the mailings occurred. 323 U.S. at 96, 65 S.Ct. 148. He further argued that smooth clearance of the checks was essential to the continuation of the defendants' ongoing fraudulent scheme. 323 U.S. at 96, 65 S.Ct. 148.

3. At most, Meredith would have been liable for $50 to BankAmericard for appellant's purchases. 15 U.S.C. § 1643(a) (1970). The merchants who honored the BankAmericard were likely insulated from loss under their agreements with BankAmericard. *See* Brandel & Leonard, Bank Charge Cards: New Cash or New Credit, 69 Mich.L.Rev. 1033, 1040 (1971).

4. Appellant argues that there was insufficient proof that mailings occurred in the "ordinary course" since only two of the four vendors who testified indicated that they mailed the receipts to BankAmericard. We observe, however, that an official of the Louisville bank testified that the receipts were ordinarily received by mail, and we do not think it unreasonable to assume that, if appellant considered the matter, he reasonably foresaw that the receipts he signed in California, Florida, and Louisiana would eventually be mailed to the bank in Louisville.

that possibly the merchants from whom the goods and services had been purchased might not have billed BankAmericard for a period of time, but delay for either of these reasons would not have been attributable to the mailing process and would not have been important to the accomplishment of appellant's scheme. More important for appellant's purposes, would have been BankAmericard's procedures relating both to billing—which was accomplished by collecting receipts over a one-month period and then billing the card holder —and to minimizing the danger from card theft or loss. There is no evidence that appellant was acquainted with BankAmericard's system for preventing unauthorized use of its cards, cf. United States v. Kelem, supra, or that he counted on the delays and vagaries of the postal system to facilitate execution of his scheme. Indeed, it is as likely as not that, even if he had been concerned about delaying detection,[5] he relied on the monthly billing practice of BankAmericard or the improbability that the merchants who furnished the goods and services would telephone BankAmericard before accepting the credit card. There is simply no evidence in this record from which it can be concluded that appellant caused mailings for the *purpose* of executing his fraudulent scheme.

We are aware that at least two other circuits have adopted what amounts to a *per se* rule that the fraudulent use of a credit card constitutes mail fraud. *See* United States v. Thomas, 429 F.2d 407 (5th Cir. 1970); United States v. Reynolds, 421 F.2d 178 (5th Cir. 1970); Kloian v. United States, 349 F.2d 291 (5th Cir. 1965), cert. denied, 384 U.S. 913, 86 S.Ct. 1349, 16 L.Ed.2d 365 (1966); Adams v. United States, 312 F.2d 137 (5th Cir. 1962); United States v. Chason, 451 F.2d 301 (2d Cir. 1971), cert. denied, 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479 (1972); United

States v. Kellerman, 431 F.2d 319 (2d Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970). *But see* United States v. Lynn, 461 F.2d 759 (10th Cir. 1972). In *Adams,* the Fifth Circuit attempted to distinguish *Parr* on the ground that in *Parr,* the essence of the fraud lay in an abuse of position by school district officials whereas the use of a credit card by falsely representing oneself to be the person named on the card is a fraudulent scheme that utilizes the credit card system as such, a system which presupposes an extensive use of the mails in order to exist. 312 F.2d at 140; *see* Kloian v. United States, *supra,* 349 F.2d at 294. We find this difference unconvincing. We do not believe that whether a federal offense has occurred should depend on the form of improper use of a credit card. Whether a card is stolen, is used by a proper person for an improper purpose, is found by a stranger, or is duplicated or counterfeited, its improper use works to defraud either the card issuer or the card holder. In *Parr,* the Supreme Court stated that such a fraud, even though incidental mailings result, does not constitute mail fraud. We are bound by that determination.

The Fifth Circuit also attempted to distinguish *Parr* on the ground that the use of the mails to forward the sales slips caused a delay that enabled the defendant to expand the scope of his operations. Although we do not disagree that this can be a valid distinction under different circumstances, we have determined that the record in this case does not support such a finding.

■ It is clear that Congress could constitutionally punish appellant's improper use of the credit card. Congress could amend the mail fraud statute to delete the purposive-use requirement. *Cf.* United States v. Sheridan, 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359 (1946); National Commission on Reform of Fed-

---

5. The card expired at the end of May 1971, and appellant returned to Kentucky on May 8 or 9, 1971. He would have been unable to keep up the scheme indefinitely. In fact, he claimed at trial he destroyed the card upon his return.

eral Criminal Laws, Study ·Draft of a New Federal Criminal Code §§ 201(e), (g), (h), (j), 1731–41 (1970). Or, Congress could enact special laws concerned specifically with the misuse of credit cards. In 1970, Congress adopted the latter approach by amending the Truth in Lending Act, 15 U.S.C. §§ 1601–1665, to provide that

> [w]hoever, in a transaction affecting interstate or foreign commerce, uses any counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit card to obtain goods or services, or both, having a retail value aggregating $5,000 or more, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

15 U.S.C. § 1644. If Congress had agreed with the Fifth Circuit rule making the unauthorized use of a credit card a *per se* violation of the mail fraud statute, it would not have found it necessary to have enacted this amendment. Moreover, by establishing a jurisdictional floor of $5,000 in the statute, Congress appears to have decided to make the aggravated misuse of credit cards, *e. g.*, by organized criminals, a federal offense and to leave to local prosecution the casual or incidental misuses unless the offender makes a purposeful use of the mails to accomplish his scheme.

We do not hold that the fraudulent use of a credit card can never constitute a violation of the mail fraud statute. In holding that no such violation was proved here, we merely recognize and apply the principle that

> the jurisdiction of federal courts is defined and limited by the Constitution and congressional action; hence, statutes such as section 1341 should be carefully and strictly construed in

order to avoid extension beyond the limits intended by Congress. [Citations omitted.] Moreover, such construction is especially appropriate where, as here, the Government urges that we construe a federal criminal statute so that it reaches conduct which the states should appropriately control and which they can control effectively.

United States v. Kelem, *supra*, 416 F.2d at 347.

For the foregoing reasons, we conclude that Maze's convictions on the first four counts cannot stand. In reversing these convictions, we align ourselves with the Tenth Circuit, which has recently reversed a conviction based on facts substantially the same as those presented here. United States v. Lynn, 461 F.2d 759 (10th Cir. 1972). Here, as in *Lynn*, "the transactions . . . by use of the [Meredith] credit card [were] completed when the goods were received in exchange for the credit card sales drafts. It is immaterial what method the retail establishments chose to collect from BankAmericard." 461 F.2d at 762–763.

■■■ There remains the question whether evidence sufficient to support appellant's Dyer Act conviction was presented to the jury. We answer this question in the affirmative.[6]

As stated above, Charles Meredith testified that on April 9 appellant left with Meredith's 1968 Pontiac Tempest automobile. Meredith stated that, except for one incident on March 5, 1971, when Maze allegedly took the car without permission, appellant had driven the car only when Meredith was with him. Meredith testified that appellant did not have permission to take the car on April 9.

---

6. We have determined that, even though we affirm the Dyer Act conviction, for which appellant received a concurrent five-year sentence, we should consider the mail fraud convictions as well. No jurisdictional impediment prevents our doing so, and no considerations of judicial economy or efficiency have been urged to us that would outweigh the interest of appellant in the opportunity to clear his record of a conviction of a federal felony. *See* Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

Troy Butler, an employee of Aamco Transmissions in Knoxville, Tennessee, testified that on Friday, May 7, 1971, appellant requested Aamco to tow in the Pontiac automobile for repair. Butler testified that he had the car picked up in midafternoon and that appellant asked for a loaner to drive to a motel until the Pontiac was repaired. Maze signed a repair order in Meredith's name and exhibited Meredith's driver's license. Butler asserted that he allowed appellant to use a 1964 Chevrolet for the purpose of going to a motel and that appellant was to return the car later that day. Maze left with the Chevrolet and telephoned Butler a few minutes later to state that he was at the motel and would return the car the next morning. Butler testified that he told him to return it by 12:00 noon on Saturday. When Maze did not return the car, and after Butler's employer tried unsuccessfully to reach him at the motel, the car was reported stolen on Monday morning, May 10.

Kentucky state police officer Bruce Slack testified that in the early morning of Sunday, May 9, 1971, he was called to the scene of a hit-and-run automobile accident in Larue County, Kentucky, where he discovered a 1964 Chevrolet automobile on the side of the road. Appellant, who was semi-conscious and had been drinking, was in the car and was arrested. The officer did not discover that the car had been reported stolen until May 29, 1971.

Appellant contradicted much of this testimony. He testified that Meredith had often let him drive the car and that he took the car on April 9 with Meredith's permission. He stated that the Aamco employee had given him permission to keep the loaner until Monday morning, that no statements concerning appellant's checking into a motel had been made, and that he had intended to return the car by Monday morning. He stated that on Saturday night he was driving to Elizabethtown, Kentucky, to visit friends.

Relying primarily on United States v. Wyatt, 437 F.2d 1168 (7th Cir. 1971), appellant contends that his possession of the loaner was permissive and that he therefore did not steal it. And, since the car was not reported stolen until Monday morning, he contends he did not transport a stolen car in interstate commerce.

We believe the *Wyatt* case is inapposite because, viewing the evidence and the inferences to be drawn therefrom in the light most favorable to the Government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), United States v. Salter, 346 F.2d 509 (6th Cir. 1965), cert. denied, 383 U.S. 943, 86 S.Ct. 1196, 16 L.Ed.2d 206 (1966), we conclude that there was evidence from which the jury could have determined that the loaner had been obtained by trick or device with the intent to deprive the owner of the rights and benefits of ownership. *See* Stone v. United States, 385 F.2d 713, 715 (10th Cir. 1967), cert. denied, 391 U.S. 966, 88 S.Ct. 2038, 20 L.Ed.2d 880 (1968). There was testimony that Maze had taken Meredith's credit card, car, and identification without permission, that he represented himself as Meredith to the Aamco employee, and that he did not return the loaner within the designated time. The jury could have inferred from this that when appellant obtained the loaner, he had formed the requisite intent to steal the car before transporting it in interstate commerce. *See* United States v. Ellis, 428 F.2d 818 (8th Cir. 1970); Stewart v. United States, 395 F.2d 484 (8th Cir. 1968); Dennison v. United States, 385 F.2d 905 (5th Cir. 1967); United States v. Dillinger, 341 F.2d 696 (4th Cir. 1965); Compton v. United States, 305 F.2d 119 (9th Cir. 1962); Crawford v. United States, 188 F.2d 536 (6th Cir. 1951). That the car had not been reported stolen prior to appellant's apprehension does not mandate a contrary result. *See* McCarthy v. United States, 403 F.2d 935 (10th Cir. 1968).

Moreover, even if appellant obtained the car lawfully, the evidence is sufficient to support a jury determination that appellant developed the intent to convert the car to his own use before he transported it in interstate commerce. *See* Johnson v. United States, 384 F.2d 388 (10th Cir. 1967); Wilson v. United States, 214 F.2d 313 (6th Cir. 1954).

Reversed in part and affirmed in part.