# UNITED STATES *v.* MAZE

No. 72–1168.  Argued November 13–14, 1973—
Decided January 8, 1974

REHNQUIST, J., delivered the opinion of the Court, in which
DOUGLAS, STEWART, MARSHALL, and POWELL, JJ., joined.  BURGER,
C. J., filed a dissenting opinion, in which WHITE, J., joined, *post*,
p. 405.  WHITE, J., filed a dissenting opinion, in which BURGER, C. J.,
and BRENNAN and BLACKMUN, JJ., joined, *post*, p. 408.

*Jewel S. Lafontant* argued the cause for the United States. On the brief were *Solicitor General Bork, Assistant Attorney General Petersen,* and *Jerome M. Feit.*

*William T. Warner,* by appointment of the Court, *post,* p. 997, argued the cause and filed a brief for respondent.

Mr. Justice Rehnquist delivered the opinion of the Court.

In February 1971 respondent Thomas E. Maze moved to Louisville, Kentucky, and there shared an apartment with Charles L. Meredith. In the spring of that year respondent's fancy lightly turned to thoughts of the sunny Southland, and he thereupon took Meredith's BankAmericard and his 1968 automobile and headed for Southern California. By presenting the BankAmericard and signing Meredith's name, respondent obtained food and lodging at motels located in California, Florida, and Louisiana. Each of these establishments transmitted to the Citizens Fidelity Bank & Trust Co. in Louisville, which had issued the BankAmericard to Meredith, the invoices representing goods and services furnished to respondent. Meredith, meanwhile, on the day after respondent's departure from Louisville, notified the Louisville bank that his credit card had been stolen.

Upon respondent's return to Louisville he was indicted on four counts of violation of the federal mail fraud statute, 18 U. S. C. § 1341, and one count of violation of the Dyer Act, 18 U. S. C. § 2312. The mail fraud counts of the indictment charged that respondent had devised a scheme to defraud the Louisville bank, Charles L. Meredith, and several merchants in different States by unlawfully obtaining possession of the BankAmericard issued by the Louisville bank to Meredith, and using the card to obtain goods and services. The indictment charged that respondent had obtained goods and services

at four specified motels by presenting Meredith's Bank-Americard for payment and representing himself to be Meredith, and that respondent knew that each merchant would cause the sales slips of the purchases to be delivered by mail to the Louisville bank which would in turn mail them to Meredith for payment. The indictment also charged that the delay in this mailing would enable the respondent to continue purchasing goods and services for an appreciable period of time.

Respondent was tried by a jury in the United States District Court for the Western District of Kentucky. At trial, representatives of the four motels identified the sales invoices from the transactions on Meredith's Bank-Americard which were forwarded to the Louisville bank by their motels. An official of the Louisville bank testified that all of the sales invoices for those transactions were received by the bank in due course through the mail, and that this was the customary method by which invoices representing BankAmericard purchases were transmitted to the Louisville bank. The jury found respondent guilty as charged on all counts, and he appealed the judgment of conviction to the Court of Appeals for the Sixth Circuit. That court reversed the judgment as to the mail fraud statute, but affirmed it as to the Dyer Act. 468 F. 2d 529 (1972).[1] Because of an apparent conflict among the courts of appeals as to the circumstances under which the

---

[1] The Court of Appeals determined that even though it affirmed respondent's Dyer Act conviction, for which he had received a concurrent five-year sentence, it should also consider the mail fraud convictions as well. There is no jurisdictional barrier to such a decision, *Benton* v. *Maryland,* 395 U. S. 784 (1969), and the court decided that "no considerations of judicial economy or efficiency have been urged to us that would outweigh the interest of appellant in the opportunity to clear his record of a conviction of a federal felony." 468 F. 2d, at 536 n. 6. We agree that resolution of the mail fraud questions presented by this case is appropriate.

fraudulent use of a credit card may violate the mail fraud statute,[2] we granted the Government's petition for certiorari. 411 U. S. 963 (1973). For the reasons stated below, we affirm the judgment of the Court of Appeals.

The applicable parts of the mail fraud statute provide as follows: [3]

> "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining

---

[2] The decision of the Court of Appeals for the Tenth Circuit in *United States* v. *Lynn,* 461 F. 2d 759 (1972), appears consistent with the decision of the Sixth Circuit in the instant case. Five other courts of appeals apparently take a contrary view. *E. g., United States* v. *Kellerman,* 431 F. 2d 319 (CA2), cert. denied, 400 U. S. 957 (1970); *United States* v. *Chason,* 451 F. 2d 301 (CA2 1971), cert. denied, 405 U. S. 1016 (1972); *United States* v. *Madison,* 458 F. 2d 974 (CA2), cert. denied, 409 U. S. 859 (1972); *United States* v. *Ciotti,* 469 F. 2d 1204 (CA3 1972), cert. pending, No. 72–6155; *Adams* v. *United States,* 312 F. 2d 137 (CA5 1963); *Kloian* v. *United States,* 349 F. 2d 291 (CA5 1965), cert. denied, 384 U. S. 913 (1966); *United States* v. *Reynolds,* 421 F. 2d 178 (CA5 1970); *United States* v. *Thomas,* 429 F. 2d 407 (CA5 1970); *United States* v. *Kelly,* 467 F. 2d 262 (CA7 1972), cert. denied, 411 U. S. 933 (1973); *United States* v. *Kelem,* 416 F. 2d 346 (CA9 1969), cert. denied, 397 U. S. 952 (1970).

[3] The full text of the section reads as follows:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any

money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do . . . knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any [matter or thing whatever to be sent or delivered by the Postal Service] shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U. S. C. § 1341.

In *Pereira* v. *United States,* 347 U. S. 1, 8–9 (1954), the Court held that one "causes" the mails to be used where he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended . . . ." We assume, as did the Court of Appeals, that the evidence would support a finding by the jury that Maze "caused" the mailings of the invoices he signed from the out-of-state motels to the Louisville bank. But the more difficult question is whether these mailings were sufficiently closely related to respondent's scheme to bring his conduct within the statute.[4]

---

such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U. S. C. § 1341.

[4] The Government indicates that in 1969 it was estimated that more than 300 million consumer credit cards were in circulation, with annual charges between $40 billion and $60 billion. It was also estimated that, in 1969, 1.5 million cards were lost or stolen, and that losses due to fraud had risen from $20 million in 1966 to $100 million in 1969. Brief for United States 14 n. 2, citing 115 Cong. Rec. 38987 (1969). The mail fraud statute, first enacted in 1872, c. 335, § 301, 17 Stat. 323, while obviously not directed at credit card frauds as such, is sufficiently general in its language to include them if the requirements of the statute are otherwise met.

Under the statute, the mailing must be "for the purpose of executing the scheme, as the statute requires," *Kann* v. *United States,* 323 U. S. 88, 94 (1944), but "[i]t is not necessary that the scheme contemplate the use of the mails as an essential element," *Pereira* v. *United States, supra,* at 8. The Government relies on *Pereira, supra,* and *United States* v. *Sampson,* 371 U. S. 75 (1962), to support its position, while respondent relies on *Kann* v. *United States, supra,* and *Parr* v. *United States,* 363 U. S. 370 (1960).

In *Kann, supra,* corporate officers and directors were accused of having set up a dummy corporation through which to divert profits of their own corporation to their own use. As a part of the scheme, the defendants were accused of having fraudulently obtained checks payable to them which were cashed or deposited at a bank and then mailed for collection to the drawee bank. This Court held that the fraud was completed at the point at which defendants cashed the checks:

"The scheme in each case had reached fruition. The persons intended to receive the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires." 323 U. S., at 94.

In *Parr, supra,* the defendants were charged, *inter alia,* with having obtained gasoline and other products and services for their own purposes by the unauthorized use of a gasoline credit card issued to the school district which employed them. The oil company which furnished products and services to the defendants would

mail invoices to the school district for payment, and the school district's payment was made by check sent in the mail. Relying on *Kann,* the Court again found that there was not a sufficient connection between the mailing and the execution of the defendants' scheme, because it was immaterial to the defendants how the oil company went about collecting its payment.

The defendant in *Pereira, supra,* was charged with having defrauded a wealthy widow of her property after marrying her. The Court describes the conduct of defendant in these words:

> "Pereira asked his then wife if she would join him in the hotel venture and advance $35,000 toward the purchase price of $78,000. She agreed. It was then agreed, between her and Pereira, that she would sell some securities that she possessed in Los Angeles, and bank the money in a bank of his choosing in El Paso. On June 15, she received the check for $35,000 on the Citizens National Bank of Los Angeles from her brokers in Los Angeles, and gave it to Pereira, who endorsed it for collection to the State National Bank of El Paso. The check cleared, and on June 18, a cashier's check for $35,000 was drawn in favor of Pereira." 347 U. S., at 5.

Thus the mailings in *Pereira* played a significant part in enabling the defendant in that case to acquire dominion over the $35,000, with which he ultimately absconded.[5]

---

[5] While it is clearly implied in this Court's opinion in *Pereira* that the El Paso bank did not immediately credit the account of the defendant, but instead awaited advice from the Los Angeles bank to which it had mailed the check, the opinion of the Court of Appeals for the Fifth Circuit in *Pereira* makes that fact abundantly clear:

"The return of [the] check from Texas to California constitutes the mailing referred to in the First Count . . . . In mailing the

Unlike the mailings in *Pereira,* the mailings here were directed to the end of adjusting accounts between the motel proprietor, the Louisville bank, and Meredith, all of whom had to a greater or lesser degree been the victims of respondent's scheme. Respondent's scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss.[6] Indeed, from his point of view, he probably would have preferred to have the invoices misplaced by the various motel personnel and never mailed at all.

The Government, however, relying on *United States* v. *Sampson, supra,* argues that essential to the success of any fraudulent credit-card scheme is the "delay" caused by use of the mails "which aids the perpetrator . . . in the continuation of a fraudulent credit card scheme and the postponement of its detection." In *Sampson,* various employees of a nationwide corporation were charged with a scheme to defraud businessmen by obtaining advance fees on the promise that the defendants would either help the businessmen to obtain loans or to sell their businesses. Even after the checks representing the fees had been deposited to the accounts of

---

check back to the bank in California on which it was drawn, the El Paso, Texas, bank sent 'instructions to wire fate,' meaning to wire whether the item was paid or not. Upon receiving a telegram stating that the check had been paid, the bank in El Paso gave Pereira its cashier's check for $35,286.01, which Pereira promptly cashed on June 19, 1951." *Pereira* v. *United States,* 202 F. 2d 830, 836 (1953).

[6] MR. JUSTICE WHITE's dissenting opinion indicates that respondent engaged in a "two-week, $2,000 transcontinental spending spree." While we are not sure of the legal significance of the amounts fraudulently charged on the credit card by the respondent, we note that the four counts of mail fraud charged in the indictment were based on charges on Meredith's credit card totaling $301.85. Brief for Respondent 4 n. 2; Brief for United States 4–5.

the defendants, however, the plan called for the mailing of the accepted application together with a form letter assuring the victims that the services for which they had contracted would be performed. The Court found that *Kann* and *Parr* did not preclude the application of the mail fraud statute to "a deliberate, planned use of the mails after the victims' money had been obtained." 371 U. S., at 80.

We do not believe that *Sampson* sustains the Government's position. The subsequent mailings there were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place. But the successful completion of the mailings from the motel owners here to the Louisville bank increased the probability that respondent would be detected and apprehended. There was undoubtedly delay in transmitting invoices to the Louisville bank, as there is in the physical transmission of any business correspondence between cities separated by large distances. Mail service as a means of transmitting such correspondence from one city to another is designed to overcome the effect of the distance which separates the places. But it is the distance, and not the mail service,[7] which causes the time lag in the physical transmission of such correspondence.[8]

---

[7] Since we are admonished that we may not as judges ignore what we know as men, we do not wish to be understood as suggesting that delays in mail service are solely attributable to the distance involved. If the Postal Service appears on occasion to be something less than a 20th century version of the wing-footed Mercury, the fact remains that the invoices were mailed to and were ultimately received by the Louisville bank.

[8] Distance is not the only cause of delay. The Court of Appeals noted that BankAmericard had a billing system in which billing was

Congress has only recently passed an amendment to the Truth in Lending Act [9] which makes criminal the use of a fraudulently obtained credit card in a "trans-

accomplished by collecting receipts over a one-month period and then billing the card holder. 468 F. 2d, at 535. It might reasonably be argued that respondent himself used facilities of interstate travel for the purpose of executing his scheme, since the large distances separating the defrauded motels from one another and from the Louisville bank probably did make it more difficult to apprehend him than if he had simply defrauded local enterprises in Louisville. But the statute is cast, not in terms of use of the facilities of interstate travel, but in terms of use of the mails.

[9] Volume 84 Stat. 1127, 15 U. S. C. § 1644 provides:

"Whoever, in a transaction affecting interstate or foreign commerce, uses any counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit card to obtain goods or services, or both, having a retail value aggregating $5,000 or more, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

The Court of Appeals felt that the enactment by Congress of the above amendment to the Truth in Lending Act manifested a legislative judgment that credit card fraud schemes were to be excluded from the application of the mail fraud statute "unless the offender makes a purposeful use of the mails to accomplish his scheme." 468 F. 2d, at 536.

Respondent contends that the passage of the amendment indicates that Congress believed in 1970 that credit card fraud was not a federal crime under 18 U. S. C. § 1341 or otherwise. Respondent also notes that the legislative history of the passage of the amendment indicates that the original bill, as enacted by the Senate, contained no jurisdictional amount limitation. The Senate-House conferees, at the request of the Department of Justice, later added the limitation of federal jurisdiction under the section to purchases exceeding $5,000. Brief for Respondent 16–21.

The Government contends that the Court of Appeals erred in attaching significance to the 1970 amendment, urging that there is no indication that Congress intended its provisions to be the sole vehicle for the federal prosecution of credit card frauds. Brief for

action affecting interstate or foreign commerce." 84 Stat. 1127, 15 U. S. C. § 1644. Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme.[10] But it did not do this; instead, it required that the use of the mails be "for the purpose of executing such scheme or artifice . . . ." Since the mailings in this case were not for that purpose, the judgment of the Court of Appeals is

*Affirmed.*

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE WHITE joins, dissenting.

I join in the dissent of MR. JUSTICE WHITE which follows but add a few observations on an aspect of the Court's holding which seems of some importance. Section 1341 of Title 18 U. S. C. has traditionally been used against fraudulent activity as a first line of defense. When a "new" fraud develops—as constantly happens— the mail fraud statute becomes a stopgap device to deal

---

United States 33–37, citing *United States* v. *Beacon Brass Co.,* 344 U. S. 43, 45 (1952).

We deem it unnecessary to determine the significance of the passage of the amendment, since we conclude without resort to that fact that the mail fraud statute does not cover the respondent's conduct in this case.

[10] We are admonished by THE CHIEF JUSTICE in dissent that the "mail fraud statute must remain strong to be able to cope with the new varieties of fraud" which threaten "the financial security of our citizenry" and which "the Federal Government must be ever alert to combat." We believe that under our decision the mail fraud statute remains a strong and useful weapon to combat those evils which are within the broad reach of its language. If the Federal Government is to engage in combat against fraudulent schemes not covered by the statute, it must do so at the initiative of Congress and not of this Court.

on a temporary basis with the new phenomenon, until particularized legislation can be developed and passed to deal directly with the evil. "Prior to the passage of the 1933 [Securities] Act, most criminal prosecutions for fraudulent securities transactions were brought under the Federal Mail Fraud Statute." Mathews, Criminal Prosecutions Under the Federal Securities Laws and Related Statutes: The Nature and Development of SEC Criminal Cases, 39 Geo. Wash. L. Rev. 901, 911 (1971). Loan sharks were brought to justice by means of 18 U. S. C. § 1341, Lynch, Prosecuting Loan Sharks Under the Mail Fraud Statute, 14 Ford. L. Rev. 150 (1945), before Congress, in 1968, recognized the interstate character of loansharking and the need to provide federal protection against this organized crime activity, and enacted 18 U. S. C. § 891 *et seq.,* outlawing extortionate extensions of credit. Although inadequate to protect the buying and investing public fully, the mail fraud statute stood in the breach against frauds connected with the burgeoning sale of undeveloped real estate, until Congress could examine the problems of the land sales industry and pass into law the Interstate Land Sales Full Disclosure Act, 82 Stat. 590, 15 U. S. C. § 1701 *et seq.* Coffey & Welch, Federal Regulation of Land Sales: Full Disclosure Comes Down to Earth, 21 Case W. Res. L. Rev. 5 (1969). Similarly, the mail fraud statute was used to stop credit card fraud, before Congress moved to provide particular protection by passing 15 U. S. C. § 1644.

The mail fraud statute continues to remain an important tool in prosecuting frauds in those areas where legislation has been passed more directly addressing the fraudulent conduct. Mail fraud counts fill pages of securities fraud indictments even today. Mathews, *supra,* 39 Geo. Wash. L. Rev., at 911. Despite the pervasive Gov-

ernment regulation of the drug industry, postal fraud statutes still play an important role in controlling the solicitation of mail-order purchases by drug distributors based upon fraudulent misrepresentations. Hart, The Postal Fraud Statutes: Their Use and Abuse, 11 Food Drug Cosm. L. J. 245, 247, 261 (1956). Maze's interstate escapade—of which there are numberless counterparts—demonstrates that the federal mail fraud statute should have a place in dealing with fraudulent credit card use even with 15 U. S. C. § 1644 on the books.

The criminal mail fraud statute must remain strong to be able to cope with the new varieties of fraud that the ever-inventive American "con artist" is sure to develop. Abuses in franchising and the growing scandals from pyramid sales schemes are but some of the threats to the financial security of our citizenry that the Federal Government must be ever alert to combat. Comment, Multi-Level or Pyramid Sales Systems: Fraud or Free Enterprise, 18 S. D. L. Rev. 358 (1973).

The decision of the Court in this case should be viewed as limited to the narrow facts of Maze's criminal adventures on which the Court places so heavy a reliance, and to the Court's seeming desire not to flood the federal courts with a multitude of prosecutions for relatively minor acts of credit card misrepresentation considered as more appropriately the business of the States. The Court of Appeals, whose judgment is today affirmed, was careful to state that "[w]e do not hold that the fraudulent use of a credit card can never constitute a violation of the mail fraud statute." 468 F. 2d 529, 536 (1972). The Court's decision, then, correct or erroneous, does not mean that the United States ought, in any way, to slacken its prosecutorial efforts under 18 U. S. C. § 1341 against those who would use the mails in schemes to defraud the guileless members of the public with

worthless securities, patent medicines, deeds to arid and inaccessible tracts of land, or other empty promises of instant wealth and happiness. I agree with MR. JUSTICE WHITE that the judgment of the Court of Appeals was error and should be reversed.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE, MR. JUSTICE BRENNAN, and MR. JUSTICE BLACKMUN concur, dissenting.

Until today the acts charged in the indictment in this case—knowingly causing four separate sales invoices to be mailed by merchants to the bank that had issued the stolen BankAmericard in furtherance of a scheme to defraud the bank by using the credit card without authorization and by falsely securing credit—would have been a criminal offense punishable as mail fraud under 18 U. S. C. § 1341.[1] But no more. By misreading this Court's prior decisions and giving an unambiguous federal criminal statute an unrealistic reading, the majority places beyond the reach of the statute a fraudulent scheme that by law is not consummated until after the mails have been used, that utilizes the mails as a cen-

---

[1] See, e. g., United States v. Kelly, 467 F. 2d 262 (CA7 1972), cert. denied, 411 U. S. 933 (1973); United States v. Madison, 458 F. 2d 974 (CA2), cert. denied, 409 U. S. 859 (1972); United States v. Chason, 451 F. 2d 301 (CA2 1971), cert. denied, 405 U. S. 1016 (1972); United States v. Kellerman, 431 F. 2d 319 (CA2), cert. denied, 400 U. S. 957 (1970); United States v. Thomas, 429 F. 2d 407 (CA5 1970); United States v. Kelem, 416 F. 2d 346 (CA9 1969), cert. denied, 397 U. S. 952 (1970); Adams v. United States, 312 F. 2d 137 (CA5 1963).

The majority recognizes that prior to this decision at least five courts of appeals had taken a view contrary to that reached by the court below. Ante, at 398 n. 2. The Court of Appeals in this case relied upon United States v. Lynn, 461 F. 2d 759 (CA10 1972), but the indictment in that case did not allege that the plan defrauded the authorized card holder or the credit card issuer.

tral, necessary instrumentality in its perpetration, and that demands federal investigatory and prosecutorial resources if it is to be effectively checked. Because I cannot subscribe to the majority's reasoning or the result it reaches, I dissent.

As "part of his scheme and artifice to defraud," respondent was charged with "obtain[ing] property and services on credit through the use of" an unlawfully possessed BankAmericard and "by means of false and fraudulent pretenses, representations and promises . . . ." App. 5, 6. The property and services were obtained from Citizens Fidelity Bank and Trust Company of Louisville, Kentucky, a BankAmericard licensee, Charles Meredith, the authorized card holder and user, and various persons and business concerns "which had previously entered into agreements with BankAmericard to furnish property and services on credit to the holders of BankAmericards . . . ." *Id.*, at 6. The indictment also charged that the mails played an indispensable role in respondent's fraudulent activities:

> "It was a further part of his scheme and artifice to defraud that the defendant would and did obtain property and services on credit through the use of [the] BankAmericard . . . by charging purchases on credit, well knowing at the time that the bank copies of the sales invoices recording these purchases would be, and were, delivered by mail to Citizens Fidelity Bank and Trust Company, Louisville, Kentucky, according to the directions thereon for posting to the BankAmericard account of Charles L. Meredith, that copies of these sales invoices, together with a bill for the accumulated charges, would subsequently be mailed in the normal course of business to Charles L. Meredith; and that the delay inherent in this posting and mailing would enable

the defendant to continue to make purchases with [the] BankAmericard . . . before his scheme and artifice to defraud could be detected." *Id.*, at 6–7.

## I

Section 1341 proscribes use of the mails "for the purpose of executing" a fraudulent scheme. The trial court had instructed the jury that it could convict on the four mail fraud counts only if it found, *inter alia*, that "the mails were in fact used *to carry out* the scheme and that the use of the mails was reasonably foreseeable. The mail matter need not disclose on its face a fraudulent representation or purpose, but need only be intended *to assist in carrying out* the scheme to defraud." App. 37 (emphasis added). Viewing each fraudulent transaction as consummated at the time respondent received goods in exchange for signing the BankAmericard sales drafts, the Court of Appeals held that respondent did not cause the subsequent mailings "for the *purpose* of executing his fraudulent scheme." 468 F. 2d 529, 535 (emphasis in original). The court below acknowledged that "the fraud was directed against the card issuer and the card holder," but it nevertheless concluded that the relevant perspective was respondent's. "As far as [respondent] was concerned, his transaction was complete when he checked out of each motel; the subsequent billing was merely 'incidental and collateral to the scheme and not a part of it.'" *Id.*, at 534, quoting *Kann* v. *United States*, 323 U. S. 88, 95 (1944).

The majority has uncritically embraced this unnecessarily restrictive approach to construing the statute. Like the Court of Appeals, it has selectively seized upon language in our prior decisions in pursuit of its notion that the fraudulent scheme ended when respondent duped

the motels into giving him goods and services on credit. We are told, for example, as in *Kann, supra,* where the mails were used to deliver checks drawn from a dummy corporation as part of a scheme by corporate officers to defraud their own corporation, that the scheme here "had reached fruition," that the person "intended to receive the [goods and services] had received it irrevocably," that it was "immaterial . . . to any consummation of the scheme" how the sales invoices were forwarded by the motels to the issuing bank for payment and billing to the card holder, and that the so-called billing process was, as previously noted, "incidental and collateral to the scheme and not a part of it." 323 U. S., at 94, 95. "Therefore, only if the mailings were 'a part of the execution of the fraud,' or, as we said in *Pereira* v. *United States,* 347 U. S. 1, 8, were 'incident to an essential part of the scheme,' do they fall within the ban of the federal mail fraud statute." *Parr* v. *United States,* 363 U. S. 370, 390 (1960).

What the majority overlooks is the salient fact that the fraud in this case—and most others involving unauthorized use of credit cards—was practiced on the card issuer and not on the individual merchants who furnished lodgings and meals to respondent. As the Court of Appeals itself recognized, "[t]he merchants who honored the BankAmericard were likely insulated from loss under their agreements with BankAmericard. *See* Brandel & Leonard, Bank Charge Cards: New Cash or New Credit, 69 Mich. L. Rev. 1033, 1040 (1971)." 468 F. 2d, at 534 n. 3.[2] Here, then, the fraud was ulti-

---

[2] Almost all of the bank credit card systems presently in operation in this country rely upon a three-way transaction between the card issuer, the cardholder, and a subscribing retailer. This tripartite credit card arrangement basically entails three separate contractual

mately perpetrated upon the credit card issuer and not the merchant.[3]   The mails thus became "part of the execution of the fraud . . . ." *Kann* v. *United States,*

agreements: (1) between the bank issuing the credit card and the individual cardholder; (2) between one of the banks in the system and a local merchant; and (3) between the merchant and the cardholder.   See generally Comment, The Tripartite Credit Card Transaction: A Legal Infant, 48 Calif. L. Rev. 459 (1960).

"The most important of the many parties to such a system is the bank which issues the charge cards to the public.   The issuer-bank establishes an account on behalf of the person to whom the card is issued, and the two enter into an agreement which governs their relationship.   This agreement establishes a line of credit under which the cardholder may incur obligations to the issuer by a cash advance or through a purchase of goods or services from one of the merchant-members.

"These merchants also have an agreement with the banks requiring them to honor all charge cards issued by a member-bank, and enabling them to deposit slips evidencing sales to cardholders in an ordinary checking account at the bank with which he has reached an agreement in return for a discounted credit to that account. These slips are then cleared and forwarded through an interchange system to the member-bank which originally issued the card and from which the cardholder will be billed periodically.   The cardholder must then decide whether to make payment in full within a specified period, free of finance charges, or to defer payment and ultimately be charged an extra percentage of the amount billed." Comment, Bank Credit Cards—Contemporary Problems, 41 Fordham L. Rev. 373, 374 (1972) (footnote omitted).

Because the legal relationship between the parties is dictated by the terms of their respective agreements, the contract governs the distribution of risk for credit card frauds between the merchant and the issuer.   Under most systems, with certain exceptions for negligence on the part of the merchant if he honors an expired card or one appearing on the current "stop list" or if he makes a sale for an amount in excess of the cardholder's credit line, the issuer assumes all risks for frauds.   Murray, A Legal-Empirical Study of the Unauthorized Use of Credit Cards, 21 U. Miami L. Rev. 811, 813 (1967); Note, Credit Cards: Distributing Fraud

*supra,* at 95. Indeed, they were "an essential element" and not merely "incident to an essential part of the scheme . . . ." *Pereira v. United States,* 347 U. S. 1, 8 (1954).

Nor had respondent's plan reached fruition. For his part, he may very well not have schemed beyond obtaining the goods and services under false pretenses with a stolen credit card. But from a legal standpoint of criminal fraud, this was only the first and certainly

> "not the last step in the fraudulent scheme. It was a continuing venture. . . . The use of the

Loss, 77 Yale L. J. 1418, 1420 (1968); Comment, The Tripartite Credit Card Transaction, 48 Calif. L. Rev., at 464–465.

" 'As far as the merchant is concerned, he is in the same financial and legal position as if he were receiving certified checks on a bank that does not clear at par, with no risk that the check will be returned or payment stopped, or as if he were receiving cash at a small discount for the bank's services. This firm bank commitment is what makes the merchant willing to accept a bank card as freely as cash and what makes the bank card as good as cash to its holder (and without the risks of carrying cash).

" 'Under these arrangements, the card-issuing bank takes all the credit risk, which is appropriate to the banking function it performs, the cardholder selects the merchant with whom he will deal, and the bank and the cardholder-purchaser expect the merchant to assume the merchandise risk. It is this division and allocation of risks between merchant and bank which permits the bank card to be used as though it were cash with hundreds of thousands of participating merchants throughout the country and abroad.' " Cleveland, Bank Credit Cards: Issuers, Merchants, and Users, 90 Banking L. J. 719, 723–724 (1973), quoting Statement of the American Bankers Association, the Consumers Bankers Association, Interbank Card Association, and National BankAmericard, Inc. to the Federal Trade Commission in the matter of Revised Proposed Trade Regulation Rule on Preservation of Consumers' Claims and Defenses, 4–5 (Mar. 5, 1973).

[3] Section 133 (a) of the Truth in Lending Act limited the cardholder's liability for the unauthorized use of his credit card to $50. 84 Stat. 1126, 15 U. S. C. § 1643 (a).

mails was crucial to the total success of the fraudulent project. We are not justified in chopping up . . . the scheme into segments and isolating one part from the others. That would be warranted if the scheme were to defraud [only the merchants]. But it is plain that these plans had a wider reach and that but for the use of the mails they would not have been finally consummated." *Kann* v. *United States, supra,* at 96 (DOUGLAS, J., dissenting).

Since it was the card-issuing bank that was actually defrauded, the mails were employed "for the purpose of executing [the] scheme . . . ."

## II

The mails further contributed to the realization of respondent's fraudulent scheme by creating the delay in detecting the fraud that necessarily results from the time-consuming processing of credit card invoices by mail. See *United States* v. *Chason,* 451 F. 2d 301, 303–304 (CA2), cert. denied, 405 U. S. 1016 (1971). During his two-week, $2,000 transcontinental spending spree, respondent took full advantage of this inevitable delay to continue his unlawful activities. If the motel owners had employed an instantaneous identification or verification system, respondent's fraudulent scheme would most likely have been nipped in the bud. But the simple truth of the matter is that they did not. As a direct consequence of the prevailing business practice of mailing invoices to the issuer for subsequent billing to the card holder and the system's attendant time delays, respondent was able to buy valuable time to postpone detection and thereby execute his scheme.

The majority mysteriously ignores prior decisions that 18 U. S. C. § 1341 reaches "cases where the use of the mails is a means of concealment so that further frauds

which are part of the scheme may be perpetrated."
*Kann* v. *United States, supra,* at 94–95. See *United
States* v. *Hendrickson,* 394 F. 2d 807 (CA6 1968),
cert. denied, 393 U. S. 1031 (1969); *United States* v.
*Riedel,* 126 F. 2d 81, 83 (CA7 1942); *United States* v.
*Lowe,* 115 F. 2d 596, 599 (CA7), cert. denied, 311 U. S. 717
(1940). Moreover, it fails to take appropriate account
of our most recent decision construing § 1341. In *United
States* v. *Sampson,* 371 U. S. 75 (1962), an indictment for
mail fraud had been dismissed by the District Court on
the ground that the mailings after the money had already
been obtained from the victims were not "for the pur-
pose of executing" the scheme to defraud. We reversed.

> "We are unable to find anything in either the
> *Kann* or the *Parr* case which suggests that the Court
> was laying down an automatic rule that a deliberate,
> planned use of the mails after the victims' money
> had been obtained can never be 'for the purpose of
> executing' the defendants' scheme. Rather the
> Court found only that under the facts in those cases
> the schemes had been fully executed before the mails
> were used. And Court of Appeals decisions ren-
> dered both before and after *Kann* have followed
> the view that subsequent mailings can in some
> circumstances provide the basis for an indictment
> under the mail fraud statutes." *Id.,* at 80 (footnote
> omitted).

As previously indicated, the indictment here charged
that respondent knew that the delay inherent in the
posting and mailing of the credit card invoices would
enable him to continue making purchases with the pur-
loined card before his criminal conduct could be detected.
Respondent engaged in a criminal enterprise that is by
its very nature short-lived. Every time delay in the

card holder's receipt of the forged credit card slips allows the scheme to continue that much longer. For my part, the indictment charged a crime under 18 U. S. C. § 1341, and the Government established respondent's guilt beyond a reasonable doubt.

## III

The majority's decision has ramifications far beyond the mere reversal of a lone criminal conviction. In this era of the "cashless" society, Americans are increasingly resorting to the use of credit cards in their day-to-day consumer purchases. Today well over 300 million credit cards are in circulation, and annual charges exceed $60 billion. In 1969 alone, 1.5 million credit cards were lost or stolen, resulting in fraud losses exceeding $100 million. 115 Cong. Rec. 38987 (1969). Current estimates of annual credit card fraud losses are put as high as $200 million. Cleveland, Bank Credit Cards: Issuers, Merchants, and Users, 90 Banking L. J. 719, 729 (1973). Under the result reached by the majority, only those credit card frauds exceeding $5,000 covered by 15 U. S. C. § 1644 will be subject to federal criminal jurisdiction.

Yet this burgeoning criminal activity, as evidenced by the very facts of this case, does not recognize artificial state boundaries. In the future, nationwide credit card fraud schemes will have to be prosecuted in each individual State in which a fraudulent transaction transpired. Here, for example, respondent must now be charged and tried in California, Louisiana, and Florida. This result, never intended by Congress, may precipitate a widespread inability to apprehend and/or prosecute those who would hijack the credit card system.

I dissent.