J. George SMITH, Anna Smith, Individually and Nannette Armstrong, Cheryl Wormley, Lois Horeni and Kent Smith, d/b/a Rock-I Farm, a Partnership, Plaintiffs,

v.

GRUNDY COUNTY NATIONAL BANK, Individually and as Trustee of Grundy County National Bank Trust No. 446, Ronald L. Wohlwend, James H. Tannenbaum, Richard G. Meunsch, G.W. Kemp, Jack Lewis, James E. McElvain, H.C. Abalos, Kenneth Hunt, R.B. Owen and J.A. Peterson, Individually and as Officers and Directors of Grundy County National Bank, Defendants.

No. 84 C 9719.

United States District Court, N.D. Illinois, E.D.

April 3, 1986.

Wayne F. Weiler, Lambert M. Ochsenschlager, Gary G. Piccony, Reid, Ochsenschlager, et al., Aurora, Ill., for plaintiffs.

James E. Spiotto, James M. Breen, Susan C. Hummel, Chapman & Cutler, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Former District Judge Thomas McMillen dismissed this civil RICO suit[1] in July 1985 for failure to state a claim for relief. Plaintiffs sought leave to amend their complaint and vacate the dismissal, and defendants ("the Bank")[2] renewed their motion. For the reasons stated below, we find that the amended complaint does not cure the original complaint's defects, but rather confirms that Judge McMillen's dismissal was correct, and we therefore deny plaintiffs leave to amend and decline to vacate the previous dismissal.

### A. *Procedural Background*

At the outset, we will define the procedural context and reject the Bank's contention that we cannot reach the merits. Judge McMillen issued his opinion and order dismissing the complaint on July 17, 1985. The order included a statement that "a Rule 58 judgment will be entered on behalf of all defendants." The clerk did not enter that judgment order until July 22, 1985. On July 25, 1985, plaintiffs filed their motion to vacate the dismissal under Rule 59(e) and for leave to amend the complaint. The Bank concedes that this motion was timely under that Rule's ten-day time limit. The parties appeared before Judge McMillen on July 29. He refused to vacate the dismissal because plaintiffs had not yet prepared the amended complaint. Thus, he denied the motion to vacate, but gave plaintiffs leave to file their amended complaint on or before August 2.[3] He also gave the

---

1. "RICO" is the all-too-familiar acronym for the "Racketeer Influenced and Corrupt Organizations Act," 18 U.S.C. § 1961 *et seq.*

2. While some bank officers are also named as defendants, we will refer to defendants collectively as "the Bank," since their interests coincide in our legal discussion below.

3. The minute order issued after the hearing reads:

> Plaintiff motion to vacate is denied. Plaintiff's request for extension of time to file Amended Complaint is granted to August 2, 1985.

Bank leave to oppose this filing after reviewing the new complaint. Plaintiffs filed their amended complaint on August 2. Judge McMillen never ruled on this motion before his resignation from the bench later in the year. The case was reassigned to this Court, and no action has been taken on the motion to amend.

The Bank contends that actual leave to amend the complaint was never granted since that would be inconsistent with the continued existence of the Rule 58 judgment, which has never been formally vacated. While we agree with this statement, we disagree with the Bank's conclusion that leave to amend was actually denied. After considering the entire record surrounding these events, we think this is what Judge McMillen intended and in effect ordered: He clearly intended to give plaintiffs a chance to cure the defects in their original complaint. *See* July 17, 1985 opinion at 10. ("Since the deficiencies may be ones of pleading, plaintiffs should consider ... amending.") When they appeared on July 29 without their amended complaint, he continued the motion to amend until August 2, when the amended complaint was finally filed. He said in court he would consider the amended complaint on that date. While he "denied" the motion to vacate on July 29, it is clear that he was doing so only because no new complaint was before him. In effect, he was merely refusing to *grant* the motion to vacate then, not denying it as a final matter with prejudice. Implicit in his continuance of the motion to amend was a continuance of the motion to vacate as well; otherwise, he could not allow plaintiffs to amend on August 2 because he could not also vacate the dismissal then. That was be-

cause August 2 fell outside of the ten-day period of Rule 59(e). As such, Judge McMillen could not have had the plenary power to vacate the complaint on that day, but instead would have been bound by the narrower confines of Rule 60. His continuance of the motion to amend clearly implies that he meant to retain the power to vacate the dismissal on August 2 should the amended complaint have passed muster. In short, reading the July 29 order in context, we conclude that Judge McMillen, in effect, refused to grant (rather than denied) the motion to vacate, and took it under advisement pending filing of a viable amended complaint.[4]

■ Accordingly, what we have before us is now plaintiffs' original motions to amend the complaint and to vacate the dismissal. Since we have held that the Rule 59(e) motion to vacate was, in effect, taken under advisement on July 29, 1985, pending an August 2 filing of an amended complaint, there is no problem with satisfying the ten-day period of that Rule. In deciding whether to allow plaintiffs to amend, we review the Bank's challenges to the amended complaint as we would review a normal motion to dismiss that complaint.[5] *See Massarsky v. General Motors Corp.,* 706 F.2d 111, 125 (3d Cir.1983), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). Thus, we take the well-pleaded factual allegation as true. To the extent the amended complaint rests on allegations of fraud, we require factual particularity. *See* Fed.R.Civ.P. 9(b). This means that the amended complaint must set forth the time, place and substance of the allegedly false representations or concealments. *See, e.g., Hagstrom v. Breut-*

4. We recognize that this result seemingly conflicts with his order "denying" the motion to vacate. Yet, had we not so concluded, we would have before us an order that is internally inconsistent since it allows plaintiffs leave to file an amended complaint in a case whose dismissal cannot be vacated except under Rule 60. The only sensible way to resolve the inconsistency (and to fulfill what Judge McMillen plainly intended) is to read the order as we have done. We have given meaning both to the denial of the motion to vacate and to the continu-

ance of the motion to amend. The Bank's technical reading would make the continuance a futile and absurd act.

5. Indeed, even if we granted leave to amend, we would have before us the Bank's renewed motion to dismiss. Thus, no matter how you come at it procedurally, we approach the proposed amendment under the standards of Rules 12(b)(6), 8(a)(2) and 9(b).

*man,* 572 F.Supp. 692, 697 (N.D.Ill.1983). There is no question the complaint is quite particular. But this is one of those cases where the detailed exposition of the facts reveals that plaintiffs have no right to relief; as we shall see, they have pled themselves out of court. *See American Nurses Ass'n v. State of Illinois,* 783 F.2d 716, 723, (7th Cir.1986).

### B. *Facts*

Because Judge McMillen reviewed the complaint once, and because the amended complaint does not differ significantly from the original, we will be very brief with the facts, which are much more complicated than our sketch below indicates.

The Smith plaintiffs and business partners Walter and Janice Olsen ("the Olsens") started a farm machinery dealership in 1976, incorporated as Au-Sable, Inc. In a commitment letter dated February 17, 1976, the Bank agreed to extend credit to the dealership as follows: among other things, it would create an open line of credit up to $300,000 at an interest of 1½ over the prime rate, to be secured by inventory and receivables. The commitment was expressly contingent on adequate funding of the corporation by shareholders, on personal guarantees of the five principal shareholders, and upon adequate documentation. The gist of plaintiffs' complaint is that the Bank broke this agreement in three ways and did so in ways which amount to "a scheme or schemes to defraud" them. First, in 1980 it made a loan to Smith at 3% over prime instead of 1½% over. Second, starting in 1979, it began charging monthly loan renewal fees which were not contemplated by the 1976 commitment letter. Third, the Smiths say the Bank tried to saddle them with a $40,000 loan they never agreed to take on.

**6.** That statute, 18 U.S.C. § 1341, reads in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing

### C. *Legal Analysis*

■ After carefully reviewing the complaint and its exhibits, we share Judge McMillen's conclusion that there was no scheme to defraud. Indeed, we agree with much of the Bank's analysis of the amended complaint, including its conclusion that plaintiffs have tried to dress up a contract case in fraud clothing. We shall only do a brief analysis here, otherwise relying on the Bank's arguments. As we shall show, the plaintiffs' disguise is transparent.

We will not dwell on all the elements of RICO, which have been described as a "treasure hunt." *See Sutliff, Inc. v. Donovan Cos.,* 727 F.2d 648, 652 (7th Cir.1984). For delineation of the elements, *see, e.g., Sedima, S.P.R.L. v. Imrex Co.,* —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Haroco v. American National Bank and Trust Co. of Chicago,* 747 F.2d 384 (7th Cir.1984), *aff'd per curiam,* —— U.S. ——, 105 U.S. 3291, 87 L.Ed.2d 437 (1985). The elements most relevant here are that plaintiffs must allege that defendants injured their business or property through "a pattern of racketeering activity." Racketeering activity is defined in 18 U.S.C. § 1961(1) as any of several federal crimes, the so-called "predicate offenses," including mail fraud, 18 U.S.C. § 1341. A "pattern" of racketeering activity, defined in 18 U.S.C. § 1961(5), requires, though is not necessarily satisfied by, at least two predicate offenses. *See Sedima,* 105 S.Ct. at 3285 n. 14; *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.,* 615 F.Supp. 828, 831–33 (N.D. Ill.1985). We need not decide whether the pattern requirement is met here, since it is clear not even two cognizable mail fraud offenses have been adequately alleged.

■ The mail fraud statute[6] has two broad elements: a "scheme to defraud" and a mailing made for the purpose of executing the scheme. *Pereira v. United*

> such scheme or artifice or attempting to do so, places in any post office ... any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

*States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). Courts have read this statute broadly. "[I]t reaches any plan, consummated by the use of the mails, in which artifice or deceit is employed to obtain something of value with the intention of depriving the owner of his property." *United States v. Lindsey,* 736 F.2d 433, 436 (7th Cir.1984), *quoting United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir. 1980). Fraud is often defined quite broadly as "departure from moral uprightness, fundamental honesty, fair play and candid dealings." *Id.* This last definition is perhaps so vague as to be meaningless, but it gives a flavor of how broadly courts have read the statute. Nevertheless, the statute is not boundless; it does speak in terms which require some kind of deceit, subterfuge or trickery. It speaks about "any scheme or artifice to defraud" or use of "false or fraudulent pretenses, representations, or promises." Thus, usually there must be some words, acts or sometimes silence which are calculated to mislead another into parting with something of value. *See, e.g., United States v. Dial,* 757 F.2d 163, 168 (7th Cir.1983). Specific intent to defraud is required, *see, e.g., United States v. Keane,* 522 F.2d 534, 544 (7th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). While the intended victims need not have actually been duped, such harm must have at least been contemplated. *See United States v. Barta,* 635 F.2d 999, 1005–06 n. 14 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981).

■ We agree with the Bank that the factual allegations and the exhibits reveal that there was no "scheme to defraud." We are at a loss to find factual misrepresentations, deceitful acts, sneaky omissions or anything so underhanded as to amount to a "fraudulent scheme." All we see is a complex contract dispute between the parties over the extent of the Smith's debts, and perhaps a breach of some fiduciary obligations.

Consider first the 1980 loan at 3% over prime. If the Bank were somehow trying to sneak the higher interest rate past the Smith's, this would doubtless come within the definition of "scheme to defraud." But this interest rate was plainly disclosed on the note. Mr. Smith *signed* the note, and he does not allege that he was unaware of the higher charge.[7] His real complaint is that this higher interest rate breached the terms of the Bank's 1976 commitment letter. While the Bank makes some persuasive arguments that the conditions in the 1976 letter had not been fulfilled and that the Smiths had repudiated that contract, the merits of the contract dispute do not matter. No artifice, deceit, misrepresentation or material omission was used in charging the higher interest rate on the new loan. The Bank thought it had a right to charge the higher rate and plainly disclosed the rate. Smith signed it knowingly,[8] and simply disagrees that the Bank had such a right. This is the essence of contract, not fraud, cases.

■ Next, we turn to the Bank's act of charging loan renewal fees. Again, this might have breached the 1976 contract, but it did not amount to a scheme to defraud. As before, if the Bank had tried to profit by secretly adding and hiding these charges, this would be a different case. But these charges were disclosed *in advance* to the Smiths and Olsens in two letters dated June 16, 1979 and April 8,

---

7. While it is true that the mail fraud claim does not require Smith to have been deceived, the fact that he signed the note and knew what he was signing does help show that the Bank was not using false pretenses or some artifice. All was in the open.

8. Throughout the entire dispute the Smiths were represented by counsel. In many respects, this case is like *Spiegel v. Continental Illinois National Bank,* 609 F.Supp. 1083 (N.D.Ill.1985) (Aspen, J.) (appeal pending), where represented parties dealing at arm's length disagreed over their obligations, and took forceful, though not "fraudulent" steps to enforce their interests. While some of the particulars of that case differ from those in this one, it is similar in that the plaintiffs there tried to use pleading "hocus-pocus" to turn a state law breach of contract and fiduciary duty case into a federal mail fraud and hence RICO case.

1980, from Bank Vice President, defendant Richard Muench ("Muench"). The first letter said that the bank would renew a present note (which was apparently in default) upon a charge of $3,000 per renewal. The second letter itemizes the renewal fees charged in 1979 and early 1980. The plaintiffs make an odd argument to turn those letters into mail fraud: the letters failed to mention the 1976 commitment letter, which did not provide for such renewal charges; thus, this omission meant that the Bank's claims, that it had the right to charge these fees and that plaintiffs were obligated to pay them, were "misrepresentations." If this is so, then every representation made by a business in a contract dispute is fraudulent. Plaintiffs cannot through this alchemy transform this perhaps unjustified demand for a service charge into a "scheme to defraud." While "concealment of the truth" may amount to misrepresentation, see Lindsay v. Edgar, 129 Ill.App.3d 718, 723, 84 Ill.Dec. 876, 473 N.E.2d 92, 95–96 (1984), we do not agree that given the context Muench's failure to mention the 1976 commitment letter was "concealment" as part of "a scheme to defraud." It is clear from the entire context that the Smiths, represented by counsel, knew about the contract, and Muench knew they knew. Muench's failure to disclose is immaterial, indeed, meaningless. Again, we have a dispute over contractual rights, not a scheme which involved acts, statements or omissions which can fairly be called "deceitful." Indeed, in the first letter, Muench disclosed in advance that the Bank was going to assess the charge. The Bank arguably had no right to do so, but this hardly amounts to "a scheme to defraud."

We review next the third alleged fraudulent scheme, the purportedly unauthorized $40,000 loan. We begin with a letter dated August 8, 1979, written by the Smiths' attorney saying they would no longer guarantee further loans. The Bank responded with a letter, signed by Muench and the Smiths, which confirmed an understanding that the Bank would not lend Au-Sable or Olsen any additional money; renewals of the current loans would require the Smiths' written approval. The line of credit balance was then about $160,000. As of September 30, 1980, the balance ballooned to about $272,000, which included the $21,000 loan at prime plus 3%. This increase arguably implies that the parties had terminated August 9, 1979, understanding that no additional loans should be made. In any event, on May 9, 1980, without the Smiths' consent or guaranty, the Bank lent Olsen $40,000. On September 28, 1981, defendant Ronald Wohlwend ("Wohlwend"), the Bank's president, sent Smith and Olsen, as officers of Au-Sable, an account statement. Among other things, this statement itemized three separate notes, including the one for $40,000 made to Olsen. To transmute this arguably unauthorized charge into fraud, plaintiffs allege that the Wohlwend account statement contains three "false and fraudulent representations":

a. That the sum [on the note in question] was an obligation of Au-Sable;

b. That plaintiffs J. George and Anna Smith were obligated as guarantors for the repayment of said note ...

c. That said note had been issued in accordance with [the Bank's] prior agreement of August 8, 1979, not to lend any further money to Olsen or Au-Sable without prior approval of the Smiths.

Amended Complaint ¶ 29. We are at a loss to see how plaintiffs can allege paragraphs b and c above in good faith. The letter is a simple account statement. It says nothing about the Smiths' personal liability as guarantors; it says nothing about the August 8, 1979 agreement, let alone anything about the note being "issued in accordance with" that agreement. Thus, paragraphs b and c are themselves misrepresentations. As for paragraph a, the account statement does suggest that the loan is an obligation of Au-Sable. However, that may well have been correct, rather than "false," since as we noted above the parties may have terminated the August 8, 1979 understanding when they made further loan agreements.

But even if this is wrong, the Bank was merely asserting its position that the corporation was liable for the $40,000. This would perhaps again be a different case if the Bank had buried the principal in the balance on another note. But to say merely that Au-Sable was obligated for the money is to assert, at worst, an incorrect contractual position. It was not a deception or trick of a "scheme to defraud."

▮▮▮▮ Not only do none of the three above events amount to a "scheme to defraud," none of the mailings involved did anything to "further" the imagined scheme. The statute requires a mailing "for the purpose of executing such scheme or artifice or attempting to do so." 18 U.S.C. § 1341. Mailings need not be essential to a scheme; they must merely further it, help execute it. *See, e.g., United States v. Ledesma,* 632 F.2d 670, 677 (7th Cir. 1980). Mailings made to promote, to reap the benefits of or to help conceal a scheme further it. *See United States v. Rauhoff,* 525 F.2d 1170, 1176 (7th Cir.1975) (citations omitted). However, mailings made after a scheme has reached its fruition do not further it, *see United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), and neither do mailings which conflict with the purposes of the scheme and have little effect on it. *See United States v. Staszcuk,* 502 F.2d 875, 880–81 (7th Cir. 1974).

▮▮▮ We agree with the Bank that the three mailings discussed above did not further any scheme because they *disclosed* information in a way which worked against any possible scheme. As the *Staszcuk* and *Maze* courts recognized, mailings which conflict with rather than somehow promote a scheme, do not further it. *Maze,* 414 U.S. at 403, 94 S.Ct. at 650; *Staszcuk,* 502 F.2d at 880. Where, as here, mailings did not conceal anything, misrepresent anything or lull a victim into inaction, but rather disclosed facts which *increased* the possibility that a scheme would come to light, they do not further the scheme. *Cf. Spiegel v. Continental Illinois Nat'l Bank,* 609

F.Supp. 1083 (N.D.Ill.1985) (Aspen, J.) (appeal pending).

Thus, the two letters regarding the service charges did not "further" any scheme. The first disclosed the Bank's intent to charge the handling fee. Not only does this disclosure belie plaintiffs' fraud allegations, as discussed above, its candor did not "further" a "scheme." It would be a stupid shyster indeed who would try to promote his fraud by disclosing it to his victim. The second letter again disclosed the practice signalled by the first letter. Therefore, it also revealed rather than concealed the imagined scheme. The letter relating to the $40,000 loan had the same effect. It disclosed that the Bank thought Au-Sable was obligated on that note. This could only hinder its collection efforts, since it alerted plaintiff to the Bank's legal position. In any of these contexts the plaintiffs were free to dispute the Bank's charges, and sometimes they did, but rather than pursue a contract claim in state court the plaintiffs came here several years later, dressing their claims in mail fraud clothing.

▮▮▮ Following the above events, plaintiffs restructured their debts twice, once in 1982 and once in 1983. Still represented by counsel, they protested their obligations, the $40,000 note and the service charges, but nevertheless agreed to restructurings which included those amounts. In 1984 there was an allegedly fraudulent mailing from Wohlwend associated with plaintiffs' failure to satisfy the 1983 settlement. Without further discussion, we agree with and adopt defendants' analysis of this mailing and its conclusion that, as before, no scheme to defraud existed. However, even if there was such a scheme, only one mailing is specifically alleged. Thus, since we have rejected the previous three mail fraud allegations, we are left with, at most, only one predicate act of mail fraud. Accordingly, the two RICO claims must fail.

### D. *Conclusion*

Plaintiffs may well have legitimate grievances against the Bank but they do not

belong in federal court under the RICO statute. Because there are not two viable mail fraud claims alleged in the amended complaint, we deny plaintiffs leave to amend. As such, we need not consider the Bank's numerous other attacks on those counts. The rest of the amended complaint contains state law claims, over which we no longer have pendent jurisdiction. In sum, then, we will deny plaintiffs' motion to vacate the dismissal order originally entered by Judge McMillen. It is so ordered.