**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gerald Lee PUCKETT, Whit Yancey
Mauzy, Jr., and Kevin Barry Krown,
Defendants-Appellants.**

**Nos. 81–1127, 1130 and 1138.**

United States Court of Appeals,
Tenth Circuit.

July 16, 1982.

Rehearing Denied in No. 81–1138
Sept. 9, 1982.
Certiorari Denied Dec. 13, 1982
and March 7, 1983.
See 103 S.Ct. 579, 1276.

Kenneth P. Snoke, Asst. U. S. Atty., Tulsa, Okl., N. D. Oklahoma (Frank Keating, U. S. Atty., Tulsa, Okl., with him on the brief), for plaintiff-appellee.

John S. Evangelisti of LaFond & Evangelisti, Denver, Colo., for Gerald Lee Puckett, defendant-appellant.

E. Terrill Corley, Tulsa, Okl., for Whit Yancey Mauzy, Jr., defendant-appellant.

Richard D. Irvin, Boulder, Colo., for Kevin Barry Krown, defendant-appellant.

Before SETH, Chief Judge, and McWILLIAMS, Circuit Judge, and BRIMMER,* District Judge.

McWILLIAMS, Circuit Judge.

In the first count of a seven-count indictment, Kevin Barry Krown, Gerald Lee Puckett, and Whit Yancey Mauzy, Jr., were charged with conspiring together and with other co-conspirators, both known and unknown, to commit offenses against the United States in violation of 18 U.S.C. § 371. Violations of the wire fraud statute, 18 U.S.C. § 1343,[1] and of 18 U.S.C. §§ 1014

---

* Honorable Clarence A. Brimmer, Jr., Chief Judge of the United States District Court for the District of Wyoming, sitting by designation.

1. 18 U.S.C. § 1343 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or tele-

and 2,[2] which proscribe the making of false statements for the purpose of influencing the action of a bank, the deposits of which are insured by the Federal Deposit Insurance Corporation, were alleged in count one as the objects of the conspiracy.

Counts two through seven of the indictment charged the three defendants with transmitting money orders by means of Western Union telegraph wires for the purpose of executing their scheme to defraud, in violation of 18 U.S.C. §§ 1343 and 2. Each of these six counts was based on separate Western Union transmissions.

A jury convicted each of the three defendants on all seven counts of the indictment. All defendants appeal.

### FACTS

In the latter part of 1977, Krown and certain co-conspirators, who were not named defendants in the present case, embarked upon a fraudulent scheme which required, as an initial step, the creation of a phony bank. Krown and several others, not including Puckett or Mauzy, formed an "offshore bank" on St. Vincent Island in the Caribbean which became known as the First London Bank & Trust Company, Ltd. (First of London). Krown had the bank registered in Polk's Directory, and, in order to obtain a charter for the bank from the Vincentian government, falsified a financial statement to indicate that the bank was backed by assets valued at $258,000,000. In fact the bank had no assets.

Once the charter was granted, Krown leased an office on St. Vincent and hired employees to answer the phone and receive mail. Krown remained in New York where he met with individuals who wished to purchase phony paper from the bank. Krown

and certain unindicted co-conspirators agreed to sell First of London letters of credit and certificates of deposit to willing buyers for only 10% of the face value of the paper in cash. Those who purchased the certificates of deposit or letters of credit thereafter would attempt to persuade banks to accept the spurious First of London bank instruments as collateral for loans.

Typically, when presented with the First of London paper, the banks would phone or telex St. Vincent to verify the authenticity of the instrument. Pursuant to instructions from Krown, the employees at St. Vincent would assure the bank that the certificate of deposit or letter of credit drawn on the First of London was good.

The certificates of deposit Krown sold were redeemable two years from the date of issuance. Thus, a First of London customer purchased an approximate two-year float period before the lending bank would realize that the paper it was holding as collateral was worthless.

Sometime in 1978 Krown and his associates decided the First of London would also sell phony cashiers checks for cash in the amount of 10% of the face value of the check. Purchasers of the cashiers checks would deposit them with banks and attempt to draw on them immediately. With a cashiers check the float period was reduced to 40–60 days. During that time Krown would stall the presenter bank by attributing the delay in collection on the First of London check to the mail or bank clearing system.

In early summer of 1978, defendants Puckett and Mauzy met with Krown and others in New York and arranged to purchase four $25,000 First of London cashiers checks.[3] The four checks were sent to

vision communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. Specifically, count one of the indictment charged the defendants with knowingly and willfully making materially false statements, and knowingly and willfully causing overvalued

securities to be presented to the Union National Bank, Tulsa, Oklahoma, a bank the deposits of which were insured by the Federal Deposit Insurance Corporation, for the purpose of influencing the bank and other banks, to approve advances, commitments, and loans.

3. It does not appear that defendant Mauzy ever actually met with Krown, although he traveled

Puckett and Mauzy in Tulsa, Oklahoma, without prepayment of the usual 10% cash fee. The defendants successfully negotiated two of the four checks and immediately drew upon them. Nonetheless, Puckett refused to pay Krown and company their 10% fee for furnishing the checks. Mauzy, however, made partial payment by transferring money in small amounts through Western Union to Krown's associates in New York.

On July 6, 1978, Mauzy sent a Western Union telegraphic money order in the amount of $2,100.00 from Tulsa, Oklahoma, to New York City. Similar transmissions of money orders were made by Mauzy on July 11, 1978, July 13, 1978, July 17, 1978, July 20, 1978, and August 1, 1978. The aforementioned wire transmissions formed the basis of the separate 18 U.S.C. §§ 1343 and 2 violations alleged in counts two through seven of the indictment. After receiving some of these payments, three additional cashiers checks, each in the amount of $5,000 were sent to Mauzy in Tulsa. Mauzy obtained immediate credit on these checks also and withdrew the funds from his account.

Sometime in late July of 1978, bank officials became suspicious about the validity of the First of London checks. Although assurances were made by Krown, the First of London never paid any of the checks.

### KROWN

As his first ground for reversal on appeal, Krown renews his argument made below that the first count of the indictment charging him with conspiracy violated his right not to be placed twice in jeopardy for the same crime. From the record it appears that certain other false bank instruments issued by Krown found their way into the hands of persons (not Puckett or Mauzy) in the Denver, Colorado, area, and those persons presented the false instruments to several Denver banks. As a result of these transactions, Krown, and others, were

to New York with Puckett and met with certain of the other co-conspirators.

4. The *Blockburger* test subsequently has been reaffirmed by the Court in *Brown v. Ohio*, 432

charged in the United States District Court for the District of Colorado, *inter alia*, with conspiracy to violate 18 U.S.C. §§ 2314 and 1014 and 2. The Colorado case was tried before the Oklahoma case, and the jury in the Colorado case convicted Krown on the conspiracy count. Prior to commencement of the Oklahoma trial, Krown moved to dismiss the conspiracy count in the Oklahoma indictment on the ground that under the Fifth Amendment, his conviction in the Colorado court precluded his trial on the same charge in the Oklahoma proceeding. The trial court reserved ruling on the motion until the close of the government's case. At that time the trial court rejected Krown's double jeopardy argument.

At the outset we note that the prevailing law in this Circuit to determine the validity of a double jeopardy claim remains the "same evidence" test endorsed by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).[4] *See United States v. Zwego*, 657 F.2d 248, 251 (10th Cir. 1981), *cert. denied*, 455 U.S. 919, 102 S.Ct. 1275, 71 L.Ed.2d 460 (1982); *United States v. Martinez*, 562 F.2d 633, 637 (10th Cir. 1977); *Robbins v. United States*, 476 F.2d 26, 32 (10th Cir. 1973). That rule provides that offenses charged are identical in law and fact only if the facts alleged in one would sustain a conviction if offered in support of the other. "Where one count requires proof of a fact which the other count does not, the separate offenses charged are not identical, even if the charges arise out of the same acts." *Id.* at 32–33. In this Court, both the indictment and the transcript of the previous trial may be considered in evaluating a subsequent double jeopardy claim. *United States v. Henry*, 504 F.2d 1335, 1338 (10th Cir. 1974), *cert. denied*, 421 U.S. 932, 95 S.Ct. 1660, 44 L.Ed.2d 90 (1975) (the judgment not the indictment acts as a bar); *Tritt v. United States*, 421 F.2d 928,

U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), and most recently in *Illinois v. Vitale*, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980).

930 (10th Cir. 1970). *Cf. United States v. Cowart*, 595 F.2d 1023, 1029–30 (5th Cir. 1979) (double jeopardy focuses on the elements of the crime and not the evidence adduced).

▮▮▮ While we adhere to the same evidence test, we recognize that it has been criticized in recent years as an inadequate measurement of double jeopardy when applied to multiple prosecutions for conspiracy charges. *See, e.g., United States v. Jabara*, 644 F.2d 574, 577 (6th Cir. 1981); *United States v. Tercero*, 580 F.2d 312, 314–15 (8th Cir. 1978); *United States v. Mallah*, 503 F.2d 971, 985 (2d Cir. 1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).[5] Krown urges us to employ the "totality of the circumstances" test adopted by the Sixth and Eighth Circuits in *Jabara, supra*, and *Tercero, supra*, to determine that his double jeopardy rights were violated in the present case. We conclude, however, that whether the "totality of the circumstances" test or the "same evidence" test is applied, the record before us indicates that the Colorado and Oklahoma trials concerned separate conspiracies.

In the Colorado case, Krown was convicted of conspiring with others, none of whom were named in the Oklahoma case, to violate: (1) 18 U.S.C. § 2314, which proscribes the interstate transportation of stolen or fraudulently obtained securities; and (2) 18 U.S.C. § 1014, which proscribes making false statements to banks. The indictment in the present case included allegations of wire fraud and charged no violation of 18 U.S.C. § 2314. In the Colorado indictment four offshore banks were mentioned whereas in the present case only one was discussed. There is a time period overlap between the two indictments.

Krown in his brief on appeal contends that the Colorado court in its pretrial "Peterson" hearing to determine the existence and extent of the conspiracy, concluded that the same co-conspirators participated in that case as the court below in its "Peterson" hearing found were involved in the present case. While Krown apparently tendered a transcript of the Colorado "Peterson" hearing to the trial judge in Oklahoma, that transcript has not become part of the record on appeal. The only evidence before us pertaining to this issue is a copy of the Colorado indictment, minus its first page.

The burden of proof to establish the existence of double jeopardy is on the defendant. *United States v. Eggert*, 624 F.2d 973, 975 (10th Cir. 1980) (per curiam); *United States v. Rumpf*, 576 F.2d 818, 823 (10th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978); *United States v. Wilshire Oil Co. of Texas*, 427 F.2d 969, 976 n.12 (10th Cir.), *cert. denied*, 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970). We are satisfied the trial court's ruling that Krown failed to establish the existence of a single conspiracy encompassing both the Oklahoma and Colorado charges, is not clearly erroneous. *United States v. Martinez*, 562 F.2d 633, 638 (10th Cir. 1977). We conclude, therefore, that no double jeopardy attached.

Krown next contends that there is insufficient evidence to support his convictions on counts two through seven. Those counts charged Krown, Puckett, and Mauzy with transmitting, by means of wire, Western Union telegraphic money orders from Tulsa, Oklahoma, to New York, New York, in violation of 18 U.S.C. §§ 1343 and 2, with each count being based on a separate transmission. In this regard, the evidence showed that Mauzy did, in fact, on six different occasions transmit money orders totaling over $8,000 from Tulsa, Oklahoma, to persons in New York, New York, to pay for cashier's checks which he and Puckett had received from one of the unindicted co-conspirators.

▮▮▮ Krown's position is that his fraudulent scheme had reached fruition *before* any use of the wire services by Mauzy,

---

**5.** Other courts, while purporting to retain the "same evidence" test, scrutinize double jeopardy claims in conspiracy cases with greater care. *See United States v. Booth*, 673 F.2d 27, 29 (1st Cir. 1982); *United States v. Futch*, 637 F.2d 386, 389 (5th Cir. 1981); *United States v. Castro*, 629 F.2d 456, 461 (7th Cir. 1980).

and that accordingly he cannot be guilty of any violation of the wire fraud statute. We disagree. 18 U.S.C. § 1343 requires that the interstate transmission by means of wire be "for the purpose of executing such scheme or artifice." It is not necessary that the scheme contemplate use of the wires as an essential element of the transaction so long as the transmission is incident to the accomplishment of an essential part of the scheme. *See Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954); *United States v. Shepherd,* 511 F.2d 119, 121 (5th Cir. 1975) (discussing mail fraud).[6] Nor must the defendant personally have made the offending communications if he participated in devising the scheme to defraud in which use of interstate wires foreseeably would follow. *United States v. Benmuhar,* 658 F.2d 14, 16–17 (1st Cir. 1981).

Payment for bogus instruments received by Puckett and Mauzy was certainly an integral part of the overall scheme from its inception. There can be no doubt, of course, that Krown and his associates intended to profit from their misdeeds. Further, the communication proscribed by the wire fraud statute need not be directed to the victim of the fraudulent scheme. *United States v. Wise,* 553 F.2d 1173 (8th Cir. 1977). Use of the wires to obtain proceeds satisfies the jurisdictional element of the statute. *United States v. Sindona,* 636 F.2d 792, 802 (2d Cir. 1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981). By transmitting payment to persons in New York City, Puckett and Mauzy not only paid for bogus documents already received, but insured delivery of three additional cashiers checks.

Krown's reliance on *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), is misplaced. In that case the Supreme Court held that once the defendant has completed the scheme and received a benefit, any further mailing (or presumably, use of the wires), which served to allocate the loss between the victims, did not come within the purview of the statute. By contrast, in the instant case, the wire transmissions were made by the defendants, not innocent victims, for the purpose of transferring proceeds. Thus the scheme to defraud had not terminated.

■ Krown's third ground for reversal is of a "catch-all" variety wherein he claims that he was denied a fair trial because of "cumulative errors" committed by the trial court. We have examined each of these alleged errors, and they do not warrant reversal. The trial court did not abuse its discretion in denying Krown's motion for a third continuance. Krown was granted several continuances by the trial court in an effort to facilitate his recovery from elective surgery which Krown had undergone some months prior to trial. Frequent recesses were taken during the course of the trial so that Krown could attend physical therapy sessions. Krown was permitted to absent himself from the proceedings whenever he wished, and the nature of Krown's surgery and resulting physical problems were explained to the jury. On at least two occasions, Krown's absence during testimony was attributable not to the hip surgery, but rather to his abuse of alcohol and narcotics.

■ Krown's suggestion that he should have been tried separately was properly denied. After reviewing the record we are convinced that any hostility toward Puckett which Mauzy may have evidenced at trial was not in any respect prejudicial to Krown.

■ The alleged jury misconduct of which Krown complains is, when examined closely, only a minor matter. In this regard, it appears that one of the jurors remarked during a recess that he believed a particular witness to be a brilliant man. The witness to whom the remark was supposedly addressed did not himself understand the comment. The incident was

---

**6.** The scope of the mail fraud statute with regard to causation is considered analogous to the scope of the wire fraud statute. *United* States v. Calvert,* 523 F.2d 895, 903 (8th Cir. 1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976).

brought to the attention of the trial judge who *voir dired* three jurors and determined that none of them had been discussing the evidence. The matter did not necessitate a mistrial. We note that the juror in question was excused before the jury began deliberation.

▬ No violation of Krown's attorney-client privilege occurred when the trial court admitted into evidence certain documents and papers which were transferred to the FBI by Joseph Baudo, a man formerly employed by Krown's attorney. Contrary to Krown's assertions, these papers did not embody confidential communications between himself and his attorney, *United States v. Bump*, 605 F.2d 548, 550–52 (10th Cir. 1979), but rather were bank documents and other evidence which Krown was concealing from the FBI with Baudo's aid. Testimony from the record reveals that Krown's attorney was not even aware of the existence of many of these documents, nor was he told they had been transferred to the custody of his law clerk until after the clerk had traded them to the FBI. An attorney may not be used to insulate records an individual has previously prepared for his business. *In re Grand Jury Proceedings*, 601 F.2d 162, 171 n.7 (5th Cir. 1979).

▬ Other rulings of the trial court challenged here concerning the admissibility of certain transcripts from the Colorado trial do not warrant reversal, as Krown failed to demonstrate that the witnesses were unavailable to testify in the instant case. Fed.R.Evid. 804(b) provides that former testimony is not excluded by the hearsay rule if the declarant is unavailable as a witness. Unavailability includes situations where the declarant is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means. Fed.R.Evid. 804(a)(5). The trial court did not abuse its discretion by ruling that Krown's inability to procure the attendance of Messrs. Delman and Osserman was attributable to his attorney's tardiness in failing to attempt to subpoena those witnesses until near the end of the second week of trial.

## PUCKETT AND MAUZY

Puckett and Mauzy were business associates in Tulsa, Oklahoma, who, after meeting with Krown and his associates in New York City, purchased cashiers checks drawn on the First London Bank. Four of the checks totaling $40,000 were successfully negotiated at the Union National Bank of Tulsa, Oklahoma. The defendants soon thereafter withdrew that amount from their account. A fifth check for $25,000 was cashed at the Bank of Neodesha, Neodesha, Kansas. A third bank, the State Bank of Parsons, Parsons, Kansas, refused to cash the remaining two $25,000 cashiers checks.

Although Puckett did not testify at the trial, his defense as presented through his attorney was that he believed the checks were legitimate bank instruments. Mauzy did testify in his own behalf, and he tried to place the blame on Puckett by testifying that he had been "conned" by Puckett. In support of Mauzy's theory of the case, the trial court permitted Mauzy to testify at length concerning his business relationship with Puckett in which he continually had been disappointed by Puckett's assurances of closing big deals which invariably fell through at the last moment. Although the riches promised never materialized, Mauzy maintained that he followed Puckett blindly through rice deals and oil ventures, investing his own money in their partnership, and borrowing a substantial amount for the same purpose. Mauzy claimed that only recently had he realized that Puckett was "conning" him all along.

▬ In addition, one of Mauzy's ex-wives and his former psychologist were allowed to testify regarding Mauzy's lack of common sense and his susceptibility to manipulation by others. The trial court did not permit Mauzy, however, to call certain witnesses who would testify that they too had been "conned" by Puckett in transactions unrelated and dissimilar to the crimes charged in the indictment. Mauzy urges the refusal to admit this testimony violates

his due process right to present a defense; therefore, it constitutes reversible error.

The trial judge excluded the evidence pursuant to Fed.R.Evid. 404(b) which provides, in part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a *person* in order to show he acted in conformity therewith." (emphasis added). The rule also states several exceptions, not applicable here, under which such evidence may be admitted. Despite the plain language of the rule, Mauzy urges that the prohibition of 404(b) was not intended to apply to situations in which a defendant wishes to introduce evidence of wrongdoing by another person in order to establish his own innocence. He argues the policy underlying the rule is based upon a fear that a jury will rely on evidence that a defendant has, at other times, committed bad acts to convict him of the charged offense. Thus, he contends, the rule should not apply to instances in which the proffered evidence will not tend to show criminal disposition.

We are not inclined to interpret the rule so narrowly. Review of the Advisory Committee Notes on the Proposed Rules [of Evidence] indicates that the members of the committee were concerned not only with the prejudicial impact to a defendant in admission of extrinsic acts of evidence, but also with its limited probative value. The Committee's Note to Rule 404 provides, in part:

> Character evidence is susceptible of being used for the purpose of suggesting an inference that the person acted on the occasion in question consistently with his character. This use of character is often described as "circumstantial." ... This circumstantial use of character evidence raises questions of relevancy as well as questions of allowable methods of proof.[7]

Particularly in the present case, in which the evidence offered by Mauzy pertained to activities by Puckett unrelated and dissimilar to the charges alleged in the indictment, we hold such testimony was properly excluded as irrelevant. *See* 22 C. Wright & K. Graham, Federal Practice & Procedure §§ 5236 and 5239 (1978).

Prior to trial Puckett requested relief from the joinder pursuant to Fed.R. Crim.P. 14. The trial judge denied that motion as well as subsequent motions for severance made by Puckett's attorney during the course of the proceedings. On appeal, Puckett attempts to make much of the "hostility" which Mauzy evidenced in his testimony, and, urges such as a reason why he should have been granted a separate trial. We are not impressed with this argument. The granting or denial of a severance is a matter within the discretion of the trial judge with the burden of proof upon the defendant to show prejudice. *United States v. Rogers*, 652 F.2d 972, 976 (10th Cir. 1981); *United States v. Hopkinson*, 631 F.2d 665, 668 (10th Cir. 1980), *cert. denied*, 450 U.S. 939, 101 S.Ct. 1489, 67 L.Ed.2d 620 (1981); *United States v. Ready*, 574 F.2d 1009, 1014–15 (10th Cir. 1978). This Court has held that hostility between codefendants, or the fact one defendant may try to cast blame on the other, is not in itself sufficient reason to require separate trials, *United States v. Ready*, 574 F.2d at 1014; *Baker v. United States*, 329 F.2d 786, 787 (10th Cir.), *cert. denied*, 379 U.S. 853, 85 S.Ct. 101, 13 L.Ed.2d 56 (1964), unless the defendants can prove their defenses were irreconcilable. *United States v. Calabrese*, 645 F.2d 1379, 1384 (10th Cir.), *cert. denied*, 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1981). We do not find such irreconcilability here as the jury could have concluded that both Puckett and Mauzy believed the checks were legitimate.

---

**7.** The Advisory Notes were prepared by the Rules of Evidence Advisory Committee of the Rules of Practice and Procedure Committee of the Judicial Conference of the United States which, pursuant to the directive of the Chief Justice, drafted the Rules as approved by the Supreme Court on November 20, 1972. Congress suspended the Rules' effective date and enacted its own version on March 30, 1973, Pub.L.No. 93–12. Rule 404 in its present form was modified only slightly by Congress in a manner not relevant to the present case. We conclude, therefore, that in this instance the Advisory Committee Notes provide some insight into the mechanics of the rule.

Also, we find no error in the trial court's permitting counsel for Mauzy to attempt to impeach a government witness by using a tape recording previously made when law enforcement officers were questioning the witness. The tape, according to Mauzy, tended to exonerate him, and was admitted on that basis. Puckett, however, claims that he was prejudiced by use of the tape. We fail to perceive any prejudice. The tape was to a large extent a repetition of testimony already given by the witness.

We have considered the remaining arguments of Puckett and Mauzy and conclude that none has merit or requires comment.

Judgments affirmed.