**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

December 17, 2019

**FOR THE TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

KENNETH BREWINGTON,

    Defendant - Appellant.

No. 18-1357

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:15-CR-00073-PAB-1)**
_____

Submitted on the briefs[*]:

Virginia L. Grady, Federal Public Defender, and Josh Lee, Assistant Public Defender, on behalf of the Defendant-Appellant.

Brian A. Benczkowski, Assistant Attorney General, Matthew S. Miner. Deputy Assistant Attorney General, Anna G. Kaminska, Acting Assistant Chief, Kyle C. Hankey, Trial Attorney, and John-Alex Romano, Trial Attorney, U.S. Department of Justice, on behalf of the Plaintiff-Appellee.
_____

Before **BACHARACH**, **KELLY,** and **CARSON**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.

_____

[*]    Oral argument would not materially help us to decide this appeal. We have thus decided the appeal based on the appellate briefs and the record on appeal. *See* Fed. R. App. P. 34(a)(2); Tenth Cir. R. 34.1(G).

_____

This criminal case stems from Mr. Kenneth Brewington's efforts to recruit investors. For this recruiting, Mr. Brewington told potential investors that he owned or controlled billions in assets that didn't exist. At trial, Mr. Brewington acknowledged that much of what he had said was untrue. But he argued to the jury that he had been duped.

The jury was apparently unimpressed and found him guilty on eleven counts of (1) conspiracy to commit mail and wire fraud, (2) mail fraud, (3) wire fraud, (4) conspiracy to commit money laundering, (5) money laundering, and (6) monetary transactions in property derived from specified unlawful activity. These convictions led to a prison sentence of 70 months.[1] Mr. Brewington appeals both the convictions and the sentence.

Mr. Brewington appeals the convictions based on the district court's (1) exclusion of emails that he had sent and received and (2) restriction of testimony by another person duped by the same man who had allegedly duped Mr. Brewington.

We reject these challenges to the convictions. Mr. Brewington never offered some of the emails into evidence, so the court never had an opportunity to consider their admissibility. The district court did exclude three other emails. But if the court did err in these rulings, the errors

_____

[1]    The court also imposed three years of supervised release and ordered restitution of $563,526.78.

2

would have been harmless because (1) the court ultimately allowed Mr. Brewington to testify about the emails and (2) the evidence of his guilt was overwhelming. We also conclude that the district court didn't err in restricting testimony of a woman who had been conned. The court allowed the woman to testify and had the discretion to exclude the details of how she had been conned. We thus affirm the convictions.

Mr. Brewington also appeals his sentence, arguing that the court improperly relied on a current version of the sentencing guidelines rather than the version in effect when the offenses took place. The government concedes that the district court erred, and we agree. We thus reverse the sentence and remand for resentencing.

## I.     The district court did not commit reversible error in excluding evidence.

Mr. Brewington challenges the exclusion of emails and restriction of testimony. We reject these challenges.

### A.     Mr. Brewington failed to offer the Johnsons' emails into evidence.

Mr. Brewington argues that the district court should have allowed him to introduce emails from Mr. Shannon Johnson and his wife. Mr. Johnson's emails transmitted documents purporting to confirm a bank account of 500 million euros, and Ms. Johnson emailed a proposed contract for the supposed account. Mr. Brewington contends that these emails show that he (1) didn't create the fake documents and (2) relied on the Johnsons.

3

For the sake of argument, let's assume that Mr. Brewington is right. Even if he is, the district court didn't exclude these emails—they were never offered into evidence.

Mr. Brewington points out that he listed these emails in the final pretrial report. But a party must still offer trial exhibits into evidence, and Mr. Brewington never asked the district court to admit the Johnson emails. So Mr. Brewington never gave the district court an opportunity to decide the emails' admissibility. His appellate argument is thus waived. *See United States v. Yousef*, 327 F.3d 56, 129 (2d Cir. 2003) ("By failing to offer these reports into evidence at trial, [the appellant] has waived any right to argue before us that they should have been admitted."); *United States v. Clements*, 73 F.3d 1330, 1336 (5th Cir. 1996) (declining to consider the admissibility of letters because the appellant had not offered them into evidence); *United States v. Harvey*, 959 F.2d 1371, 1374 (7th Cir. 1992) ("[The appellant] cannot complain about the district court's 'decision' to refuse to admit evidence that he never moved to admit, or even attempted to describe.").

Mr. Brewington counters that offering the documents into evidence would have been futile because the district court had "sustained an objection that the entire 'e-mail family' of exhibits was hearsay." Defendant's Reply Br. at 2. We disagree. Mr. Brewington's contention refers to a discussion between the attorneys and the court when the court

4

was considering an objection to a different email (D50). The government stated that it was asserting the "same objection as the last e-mail family." R., vol. IV, at 1679. The court then sustained the objection to the single document being offered (D50) rather than an entire category (or "family" of emails). *Id.* ("Sustained as to the e-mail.").

Because hearsay objections are fact-specific, the district court appropriately analyzed the admissibility of each exhibit as it was offered. *See, e.g.*, *United States v. Rosario Fuentez*, 231 F.3d 700, 708 (10th Cir. 2000) (referring to the "fact specific nature of hearsay objections"). Indeed, just ten pages earlier, the district court had allowed defense counsel to introduce another email that Mr. Brewington had received. R., vol. IV, at 1668. Given this ruling and the fact-specific nature of hearsay rulings, we cannot assume that the government would have objected or that the court would have sustained the objection. We thus decline to consider the merits of Mr. Brewington's argument on the admissibility of the Johnsons' emails.

### B. If the three other emails had been erroneously excluded, the errors would have been harmless.

Mr. Brewington did try to introduce three emails involving his receipt of fabricated documents and his efforts to verify their authenticity.

5

According to Mr. Brewington, these three emails would have shown that he hadn't realized that the documents were fabricated.

Two of the documents referenced in the emails showed that Mr. Brewington had control over non-existent accounts at an Amsterdam bank, one for 500 million euros and another for 1 billion euros. Though neither account actually existed, Mr. Brewington insists that (1) he thought that they did and (2) he had been duped. The district court excluded the three emails as hearsay, and Mr. Brewington challenges these rulings.

We may assume, for the sake of argument, that the district court erred in excluding each email. Even if the court had erred, however, we would regard the errors as harmless unless they substantially influenced the outcome or left us in "grave doubt" about the potential for substantial influence. *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). Under this standard, any possible error would have been harmless because

- the district court allowed Mr. Brewington to testify about the content of the emails and

- the evidence of his guilt was overwhelming.

Mr. Brewington received the first email regarding documentation of an account for 1 billion euros. This email consisted of only three words: "See attached documents." Appellant's Supp. App'x at 1276.

From: Global Guarantees <globalguarantees@yahoo.com>
Sent: Tuesday, December 7, 2010 6:22 PM
To: kbgymcap@yahoo.com
Subject: ABN AMRO Funds
Attachments: Bank Documentation - ID █████ - Euros 1B - Premier Investment Group, Inc..zip

See attached documents.

The second excluded email was directed to an associate and asked the worth of a particular bond. Appellant's Supp. App'x at 1037.

From: Kenneth Brewington <kbgymcap@yahoo.com>
Sent: Friday, March 27, 2009 4:19 AM
To: Peter Lowe
Subject: BOND
Attachments: Bond[2]; Gold%20Cert%2014777[1]; Transfer%20Document%20jpg%20file[1]

HI Peter
Here is the Bond, please let me know if you can get a value at all, from the bank, on this instrument.
God Bless
Ken

The third email to Mr. Brewington referred to $5 billion in U.S. Treasury bonds. Appellant's Supp. App'x at 1087.

From:           boyd stephens <boydstephens@yahoo.com>
Sent:           Saturday, August 29, 2009 3:12 AM
To:             kbgymcap@yahoo.com
Subject:        Fw: RE: Requested Data

--- On Sat, 8/29/09, Vic Chandrahasan <vicchandra@gmail.com> wrote:

> From: Vic Chandrahasan <vicchandra@gmail.com>
> Subject: RE: Requested Data
> To: "'boyd stephens'" <boydstephens@yahoo.com>
> Date: Saturday, August 29, 2009, 1:59 AM Boyd,
>
> Here are the answers. Pl. See below.
>
> Best,
>
> Vic Chandrahasan
>
> -----Original Message-----
> From: boyd stephens [mailto:boydstephens@yahoo.com]
>
> Sent: Saturday, August 29, 2009 1:09 AM
> To: Vic Chandra
> Subject: Requested Data
>
> Vic,
>
> The following is what we need:
>
> 1) Cusip Number for Treasuries ▮▮▮▮▮
> 2) Where They will be lodged:  Oppenheimer, 100 Jericho Quadrangle,
> Ste.
> 342, Jericho, NY 11753 NY
> 3) Total Amount (5B, etc.): USD 5B
> 4) What increments are they in: $1M
> 5) Owners Name as of Tuesday Sept 1, 09: Aishwarlya Enterprises Inc,
> 3225 McLeod Dr, #100, Las Vegas, NV 89121
>
> This is what we need as stated by Ken during our phone conversation.
>
> Call me anytime if you have questions.
>
>
> Boyd R. Stephens
> (818) 610-2699 Direct
> (818) 297-0020 Mobile
>
>

The district court's exclusion of these emails did not stymie Mr.

Brewington's effort to show that he had been duped. Even without

introducing the three emails, Mr. Brewington conveyed precisely the same

information through his testimony:

8

1.  that he had received a document purporting to transfer 1 billion euros,

2.  that he had sent documents about this transfer in order to authenticate the assets, and

3.  that he had sent a bond to someone else to obtain verification.

Though the emails weren't admitted into evidence, the context made clear that Mr. Brewington was testifying based on existing emails. Through this testimony, the jury learned that the emails existed and heard the substance of the emails. *United States v. Gould*, 672 F.3d 930, 942 (10th Cir. 1992). In responding, the government never (1) suggested that Mr. Brewington had himself fabricated the documents or (2) denied that he had tried to confirm the documents' authenticity.

Given this testimony, defense counsel was able to argue to the jury that Mr. Brewington had received the documents and had tried to confirm their authenticity:

> You saw what was coming Ken Brewington's way. Boyd Stephens was sending him all different kinds of documents. . . . [F]rom there he sends on to Brian Elrod to see if it's any good, Treasuries that are coming his way.
>
> . . .
>
> The cons, the people who were playing these games, the Shannon Johnson and the others, have no doubt they wanted him to believe
>
> . . .
>
> They wanted people to believe this. They put this together so that they would believe it. And then Ken Brewington sends it off

to the people that he is looking to, the experts he is looking for answers from, and they confirm that they are legit.

R., vol. IV, at 2026–28. In light of Mr. Brewington's testimony and related closing arguments, the three emails themselves would have added little to his defense.

Nor would the actual emails have undercut the government's proof. The government never suggested that Mr. Brewington had fabricated the documents himself. The government instead showed that Mr. Brewington had lied about owning or controlling non-existent assets. Some of these lies related to the fake documents; many didn't.

For example, the government showed obvious shortcomings in Mr. Brewington's explanations for his ownership or control of over $2 billion in U.S. Treasury bonds and $30 million in cash. Though he testified that he had expected to get these assets from M&K Produce, this explanation was far-fetched. M&K Produce was a defunct company with no revenue. And Mr. Brewington admitted that he had never even seen the company and had reviewed only a few documents. R., vol. IV, at 1906.[2] Why would Mr. Brewington expect to receive $2 billion in U.S. Treasuries and $30 million in cash from an unknown company that was obviously defunct?

---

[2] Mr. Brewington was asked: "You really didn't do anything other than to look at some papers that were e-mailed to you to verify that M&K was even a real company, didn't you?" R., vol. IV, at 1906. He answered: "That's correct." *Id.*

10

Moreover, Mr. Brewington admitted that he hadn't just told others that he expected to get these valuable assets from M&K; he had also told others that he already possessed these assets. For instance, Mr. Brewington admitted that he had told two potential business partners that he already took the $2 billion in Treasuries and $30 million in cash, that they were in a Wachovia bank account, and that he could move these assets at a moment's notice as soon as his IRS audit was complete. But there was no Wachovia account with these assets,[3] no IRS audit, no $2 billion in Treasuries, and no $30 million in cash. At trial, Mr. Brewington acknowledged that he had claimed that he owned this $30 million at Wachovia even though he "didn't have an account anywhere and couldn't have an account at that time." R., vol. IX, at 1914.

And Mr. Brewington's admitted deception didn't stop with the $2 billion in U.S. Treasury bonds or $30 million in cash. For example, Mr. Brewington told two potential business partners that he had $9 million in a bank account. Gov't Ex. 1403A (Mr. Brewington claims: "I have 9 million dollars sitting there."). At trial, he admitted that this was a lie.

---

[3]    In 2009, Mr. Brewington's Wachovia accounts closed with balances totaling less than a dollar. R., vol. IV, at 529–32 (Mr. Brewington's checking account closed with "roughly negative $6,000" balance, and the "closing value" in his savings account was one cent.).

Mr. Brewington also said in recorded calls that he had $350 million at JP Morgan Chase and $350 million at Bank of America. Gov't Ex. 1454A. These statements were false, and Mr. Brewington didn't explain why he had told these falsehoods.

Mr. Brewington not only told others that he had nonexistent assets but also exaggerated his wealth in his financial statements. For example, in August 2009, one of his financial statements showed that he controlled assets worth roughly $3.2 billion. About a month later, another financial statement showed that he owned assets worth roughly $7 billion.[4] At trial, Mr. Brewington could not explain why or how his assets had doubled in only a month's time. And, of course, both figures were wildly inaccurate. On paper, Mr. Brewington was a billionaire; in reality, he was virtually broke.

After Mr. Brewington admitted that he had lied about his assets, he clutched to a bizarre explanation—that he had been hoodwinked by two separate individuals who had (remarkably) both managed to fake documents for nonexistent accounts at the same Amsterdam bank.

One set of fake documents purported to give Mr. Brewington control over an account containing 500 million euros (the equivalent of roughly

---

[4]     One business partner testified that he had been shown this financial statement. Mr. Brewington denied showing the financial statement to his business partner.

700 million U.S. dollars). Mr. Brewington claimed that Mr. Shannon Johnson had masterminded the creation of these fake documents.

After Mr. Johnson disappeared, Mr. Brewington received another unrelated set of fake documents for another account at the same Amsterdam bank. This time, the account had ballooned from 500 million euros to 1 billion euros. Again, no such account existed, and the documentary proof of the account was fake.

No one suggests that Mr. Johnson had anything to do with the second fake account. Nonetheless, remarkable similarities exist between the fake documents. Both reflect fictitious accounts at the same Amsterdam bank. And the two account numbers bear a remarkable similarity: Out of 20 digits in each account number, 18 are identical.



Even putting aside these remarkable coincidences, Mr. Brewington's explanations are inconsistent. Mr. Brewington now contends that Mr. Johnson had claimed ownership of the 500 million euros. But in a recorded call, Mr. Brewington said that he would put the first Amsterdam account in his own name. Mr. Brewington never indicated that he would need to obtain Mr. Johnson's approval. And Mr. Brewington told one investor in a recorded phone call that it did not matter what Shannon Johnson knew because "it's my [Mr. Brewington's] money." R., vol. IV, at 458; Gov't Ex. 1455D.

In addition to lying about his assets, Mr. Brewington lied about what he would do with the investors' funds. He told some investors that he

14

would use their money to pay IRS fines to unfreeze the 500 million euros in the Amsterdam bank account. He told others that he would use their funds to start a new business. And yet others were told that he would use the money in an "equity participation" so that he could continue using a credit line.

All of these stories were fictitious. None of the investors' funds were used to pay IRS fees, to start a new company, or to open the purported credit line.[5] Mr. Brewington wired part of the funds to his son and used other incoming funds to help keep an associate's business afloat.

In the face of this overwhelming evidence that he lied to cheat potential investors, Mr. Brewington offered the three emails into evidence.

---

[5] Mr. Brewington also admitted that he had lied about other things, such as his address, office, and whereabouts.

1. His address: Mr. Brewington listed the Brewington Holdings address as 9710 West Tropicana Avenue Ste. 120 in Las Vegas, but the broker salesperson for the business owning that property had never heard of Mr. Brewington. R., vol IX, at 1262.

2. His office: When Mr. Stozek asked why they didn't meet at Mr. Brewington's office, he was told that "the condo was being occupied, being rented out, and the office building was just not accessible, and this was the quickest, easiest path, to sit in a cafeteria." R., vol IX, at 404.

3. His whereabouts: "When I said I was in Utah, I wasn't in Utah. I was meeting with Mr. Hansen, but I wasn't actually in Utah. I should have just said I am in Vegas. I didn't. It wasn't the truth." R., vol. IX, at 1873.

Two would have shown that he had received fake documents from other individuals. But his receipt of fake documents was uncontested, for the government never suggested that Mr. Brewington had fabricated the documents himself. The other email would have shown that Mr. Brewington had asked someone about the value of one of his bonds. But the government never questioned the fact that Mr. Brewington had asked someone to value this bond.

The emails would thus not have undercut the government's powerful evidence that Mr. Brewington had lied to investors about his assets and use of the investors' funds. So even if the district court had erred in excluding the three emails, the errors would have been harmless.

**C.     The district court acted within its discretion in restricting Ms. Harrison's testimony.**

The district court allowed one of Mr. Johnson's fraud victims, Ms. Harrison, to testify that

- she had met Mr. Johnson,

- he had appeared to be wealthy,

- they had contemplated a business arrangement, and

- the business arrangement had not come to fruition.

But the court did not allow Ms. Harrison to delve into the specifics of what Mr. Johnson had done.

We thus consider whether the district court abused its discretion in restricting Ms. Harrison's testimony. *United States v. Hernandez*, 693 F.2d 996, 1000 (10th Cir. 1982). The court abused its discretion only if the ruling was "arbitrary, capricious, or whimsical, or result[ed] in a manifestly unreasonable judgment." *United States v. Jordan*, 485 F.3d 1214, 1218 (10th Cir. 2007) (quoting *United States v. Weidner*, 437 F.3d 1023, 1042 (10th Cir. 2006)).

To determine relevance, the district court had to consider the similarity of Mr. Johnson's conduct toward Ms. Harrison and Mr. Brewington. *See United States v. Puckett*, 692 F.2d 663, 670–71 (10th Cir. 1982) (upholding exclusion of a defendant's evidence that other people had been defrauded by a codefendant because the other fraud was too dissimilar). The court ultimately viewed the Harrison transaction as too different to support introduction of the specifics.

Mr. Brewington contends that the excluded details would have corroborated his own state of mind. But "the state-of-mind inquiry is not a free-for-all in which *any* evidence that could *possibly* have influenced a defendant's mental state is *necessarily* relevant; if that were the case, 'a defendant could introduce evidence that would invite the jury to speculate a non-existent defense into existence.'" *United States v. Trudeau*, 812 F.3d 578, 591 (7th Cir. 2016) (emphasis in original) (quoting *United States v. Zayyad*, 741 F.3d 452, 460 (4th Cir. 2014)).

To render the evidence admissible, Mr. Brewington had to show that Ms. Harrison's circumstances were so similar to his circumstances that Ms. Harrison's state of mind would bear on his state of mind. *See United States v. Puckett*, 692 F.2d 663, 671 (10th Cir. 1982) (holding that "unrelated and dissimilar" conduct by a third party to con someone else "was properly excluded as irrelevant" to corroborate the defendant's testimony that he had been conned by the same person); *see also United States v. Nguyen*, 526 F.3d 1129, 1135 (8th Cir. 2008) (holding that evidence of a third party's schemes to dupe other individuals was irrelevant to corroborate testimony that the defendant had also been duped by this third party). The district court could reasonably conclude that Mr. Brewington had failed to make this preliminary showing of similarity in Ms. Harrison's circumstances. *See* Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.").

Mr. Brewington contends that Ms. Harrison's excluded testimony shows that Mr. Johnson (1) had access to employees working for the Amsterdam bank (where the non-existent 500 million euros were held) and (2) intended to convince Mr. Brewington that the documents for this account were real. In district court, Mr. Brewington did not alert the court to these arguments. But even if he had, the district court could have

18

reasonably questioned how Mr. Johnson's intent or access to bank employees would bear on Mr. Brewington's state of mind.

In his reply brief, Mr. Brewington argues that the details would have shown that Ms. Harrison had believed Mr. Johnson's lies. Ultimately, however, the district court had the discretion to view Ms. Harrison's belief in Mr. Johnson's lies as irrelevant to Mr. Brewington's state of mind.

Given that discretion, we decline to disturb the district court's exclusion of the details of Ms. Harrison's experience with Mr. Johnson.

## II. The district court erred at sentencing.

Though we reject Mr. Brewington's challenges to the convictions, we vacate the sentence and remand for resentencing. Mr. Brewington brought one sentencing challenge in his opening brief and another in his reply brief. The first challenge involved a factual finding; the second involved the applicable guidelines. The government agrees with the second challenge; so do we.

The second challenge stems from the Ex Post Facto Clause. Under the Ex Post Facto Clause, the district court must apply the guideline version in effect when the offense was committed. *See Peugh v. United States*, 569 U.S. 530, 533 (2013) ("[T]here is an *ex post facto* violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher

19

applicable Guidelines sentencing range than the version in place at the time of the offense.").

To determine when Mr. Brewington committed his offenses, we focus on when they ended. *See* U.S. Sentencing Guidelines Manual § 1B1.11 cmt. n.2 (2018) (stating that the controlling date is when the offense ended). We conclude that the offenses had ended in 2011 because the government alleged that Mr. Brewington had participated in a conspiracy that ended in 2011. So the 2010 guidelines applied.

In 2010, the sentencing guidelines authorized a two-level enhancement if the offense involved at least ten victims. U.S. Sentencing Guidelines Manual § 2B1.1(b)(2)(A)(i) (2010). In 2015, the U.S. Sentencing Commission amended this provision. As amended, a court could still apply the two-level enhancement for an offense involving at least ten victims. U.S. Sentencing Guidelines Manual amend. 792 (Nov. 1, 2015). But a court could also apply the two-level enhancement for offenses that involved fewer than ten victims if any of the victims had experienced "substantial financial hardship." *Id.*

At sentencing, the district court applied the 2015 amendment. In applying this amendment, the court (1) found that two victims had experienced substantial financial hardship and (2) imposed a two-level enhancement. This enhancement was based on a guideline provision enacted years after Mr. Brewington's crimes had ended, and the

20

government concedes that application of the amendment constituted plain error.

This plain error could have affected how the guideline range was calculated. For example, the court found that two victims had experienced substantial financial hardship. This finding could trigger the two-level enhancement under the 2015 guidelines, but not under the guidelines in effect when the offenses were committed. At that time, a court could not apply the two-level enhancement if there were fewer than ten victims regardless of whether they had experienced financial hardship.

The government thus concedes that we must remand for resentencing, and we agree. On remand, the district court should consider the possibility of a two-level enhancement based on the guideline provision in effect at the time of the offenses.[6]

\* \* \*

We thus affirm the convictions, reverse the sentence, and remand for resentencing.

---

[6] In his opening brief, Mr. Brewington challenges the finding that two victims experienced substantial financial hardship. Given our decision, this challenge is moot. Substantial financial hardship is relevant only under the 2015 amendment to the guidelines, which didn't apply at the time of the offenses.